M. Michael Potoker, J.
At the suppression hearing in this case Thomas Raftery, a reporter for the Daily News, moved pursuant to CPLR 2304 to quash a subpoena and a subpoena duces tecum served on him to testify to any conversations he held with the arresting officers and to produce any notes or memos that he made at the time of his coverage of the story reporting the arrest of the two defendants and the seizure of weapons.
Petitioner’s resistance is bottomed on the ground that any order compelling him to respond to said subpoenas would be in direct contravention of his constitutional and statutory rights under the First Amendment of the United States Constitution, section 8 of article I of the New York State Constitution (freedom of press), and section 79-h of the Civil Rights Law of the State of New York (newsman’s privilege).
A witness may challenge a subpoena because it infringes upon any right guaranteed to him by law (see, e.g., Matter of City Council of City of New York v Goldwater, 284 NY 296; Dunham v Ottinger, 243 NY 423, app dismd 276 US 592; Matter of Hirshfield v Hanley, 228 NY 346, 349).
The claim of a constitutional or statutory privilege is one of many grounds for moving to quash subpoenas and subpoenas duces tecum prior to appearances or to production of the records demanded. In such cases the burden rests upon the petitioner to demonstrate that the material is privileged (see Matter of Cepedi, 233 F Supp 465).
Courts have disposed of obvious cases on motions to quash (Matter of Hooper-Holmes Bur., 173 Misc 735).
The defendants herein were arrested pursuant to the execution of a search warrant on April 24, 1974. According to the testimony adduced at the suppression hearing thus far, two detectives signed an "Affidavit for Search Warrant” earlier that day. The affidavit asserted, and the detectives so testified, that information establishing probable cause to believe that weapons were seen at the defendants’ home came from a *639 confidential informant, whom they had known previously and considered reliable as evidenced by arrests and convictions based upon information he furnished to them, who had observed the weapons in defendants’ home between April 18 and April 24.
On April 26, 1974, a news article appeared in the New York Daily News under the by-line of Thomas Raftery reporting that the defendants were arrested and charged with possession of weapons. The article also contained the following information: "Cops said that as a result of an anonymous phone tip Monday, they put the house under surveillance for two days before three detectives raided it at 10:30 last night.”
Defendants seek to controvert the search warrant and to suppress the evidence seized, on the grounds, inter alia, that the affidavit in support of the search warrant was based on perjured and erroneous statements. Since the police officers concede that they made no personal observations of defendants’ home prior to the execution of the search warrant, the major premise upon which the affidavit is founded is on their assertion that they received information from a "reliable confidential informant” to the effect that "on or about April 18, 1974 in the am said informant was present at 183 15th St. Brooklyn, NY in the County of Kings, which is a dwelling belonging to one, Henry Marahan, male white, 50 years of age, and did observe the same in possession of numerous heavy artillery weapons, i.e. tank guns, howitzers, mortars and mines. Weapons were also on the floor of said dwelling.”
The information sought by defendants from reporter Raftery is twofold: First, defendants seek to have him reveal the name of the person referred to in the article who gave him the information which led to his reporting that "Cops said that as a result of an anonymous phone tip Monday, they put the house under surveillance for two days before three detectives raided it at 10:30 last night.” Defendants argue that if Mr. Raftery were to identify that person as either of the two affiant police officers, their previous testimony concerning their obtaining information from a reliable confidential informant would be impeached in a significant manner. Secondly, they contend that even if Mr. Raftery cannot attribute that information to a particular police officer, the testimony of codefendant Henry Charles Marahan, Sr., that he overheard Detective Hantz calling various news agencies and announcing, "I just got the news,” would again serve to impeach them *640 in view of Detective Hantz’ denial on the witness stand that he reported the seizure story to the Daily News by phone.
Further illuminating defendants’ objective in this proceeding is defense counsel’s statement. Specifically, counsel stated as follows: "But, even, Your Honor, what I am trying to say, that even if Your Honor were to quash the subpoena, or essentially say the newsman does have that privilege, we would still want to have him testify as to the fact that he wrote the article and that what is contained in that article was the truth as it was given to him, that he didn’t make up any statements in that article.”
FREEDOM OF PRESS
The right of a free and unfettered press is not of recent vintage. In 1735, John Peter Zenger, a journalist and publisher, was tried for seditious libel after his paper had attacked Governor William Cosby. He was brilliantly defended by Andrew Hamilton, who offered the relatively new defense that Zenger had told the truth and that truth was a defense against libel.
The jury, swayed by Hamilton’s declaration that the cause of English liberty was at stake, acquitted "the morning star of liberty,” as Governeur Morris later called Zenger. Although the Zenger case did not immediately establish freedom of the press, its outcome was of great importance. In the near future liberty of discussion did become an issue and one which prompted James Madison later to propose the First Amendment to the Constitution of the United States forbidding Congress to pass any law abridging the freedom of speech, or of the press (enacted by Congress September 25, 1789 and ratified by three fourths of the States December 15, 1791).
The Sedition Act of 1798, among other things, made it a misdemeanor punishable by fine or imprisonment to speak or write against President or Congress "with the intent to defame” or to bring them "into contempt of disrepute.” Federalist lawyers of the day attempted to extract all meaning from the First Amendment by assuming that freedom . of press meant freedom merely from censorship, or by asserting that it was not meant to apply in time of war.
Thomas Jefferson’s classic statement still rings in the halls of freedom everywhere. "The basis of our government being the opinion of the people, the very first object should be to *641 keep the right; and were it left to me to decide whether we should have a government without newspapers, or newspapers without a government, I should not hesitate to perfer the latter.”
James Madison continued to champion the cause of freedom of speech and press even after his official retirement from public office: "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or perhaps both. Knowledge will forever govern ignorance. And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.” (To W.T. Barry, Aug. 4, 1822; 9 Writings of James Madison, p 103 [G. Hunt ed, 1910].)
The right to publish without prior governmental approval has long since been recognized (Near v Minnesota, 283 US 697; New York Times Co. v United States, 403 US 713; a right to distribute information, see, e.g., Lovell v Griffin, 303 US 444, 452; Marsh v Alabama, 326 US 501; Martin v City of Struthers, 319 US 141; and a right to receive printed matter, Lamont v Postmaster Gen., 381 US 301).
The right to disseminate news in the printed columns of a news organ is necessarily meaningless without the same guarantee extended to the gathering and collection of the news. As Justice Stewart stated in his dissenting opinion in Branzburg v Hayes (408 US 665, 728): "News must not be unnecessarily cut off at its source, for without freedom to acquire information the right to publish would be impermissibly compromised. Accordingly, a right to gather news, of some dimensions, must exist.” (See, also, Zemel v Rusk, 381 US 1.) In the same opinion Justice Stewart continued (p 728): "The right to gather news implies, in turn, a right to a confidential relationship between a reporter and his source. This proposition follows as a matter of simple logic once three factual predicates are recognized: (1) newsmen require informants to gather news; (2) confidentiality — the promise or understanding that names or certain aspects of communications will be kept off the record — is essential to the creation and maintenance of a news-gathering relationship with informants; and (3) an unbridled subpoena power — the absence of a constitutional right protecting, in any way, a confidential relationship from compulsory process — will either deter sources from divulging information or deter reporters from gathering and publishing information.”
*642 In Branzburg (supra) a newsman was a witness to the commission of criminal acts and subsequently was called before a grand jury to testify as to his observations. The court held: "The constitution does not, as it never has, exempt the newsman from performing the citizen’s normal duty of appearing and furnishing information relevant to the grand jury’s task.” (408 US 665, 691, supra.)
This ruling was limited only to the situation confronting the court. "Only where news sources themselves are implicated in crime or possess information relevant to the grand jury’s task need they or the reporter be concerned about grand jury subpoenas.” (408 US 665, 691, supra.)
In United States v Liddy (354 F Supp 208), Judge Sirica extended the Branzburg ruling as it pertained to grand jury subpoenas to subpoenas issued in the matter before him demanding the production of tapes of previously published interviews with a disclosed witness.
Are the narrow facts, however, in Branzburg (witness to criminal acts) and Liddy (tapes of previously published interviews with disclosed witness) to be applied to the instant case where we are specifically dealing with the disclosure of a confidential source and a matter collateral to the criminal act in question? This court thinks not and believes that the testimony sought here falls into the area described by Justice Powell in his concurring opinion in Branzburg.
"Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional ways of adjudicating such questions.
"In short, the courts will be available to newsmen * * * where legitimate First Amendment interests require protection.” (Branzburg, 408 US 665, 710, supra; n. omitted, emphasis supplied.)
In Matter of Dan (80 Misc 2d 399), Stewart Dan, an em *643 ployee of WGR-TV, a Buffalo television station, moved to quash and vacate a certain subpoena served on him by the Attorney-General’s office requiring his testimony as to the events he observed at the Attica Correctional Facility between September 9, 1971 through September 13, 1971. Mr. Dan was sent by his TV station as a broadcast journalist to cover this disorder at the Attica Correctional Facility.
The court, when considering the issues of the case in light of the First Amendment, said (p 404):
"Whenever a question involving this sacred right is brought before the courts, there must be an intense weighing of all the different factors involved. We are dealing here with a balancing of interests between the public interest, in the fair and effective administration of justice, and the First Amendment guarantee which provides the press with the right of mass circulation of newspapers and electronic media so as to disseminate ideas and information to the general public.”
The thrust of petitioner’s claim herein is that the burden on news gathering resulting from compelling reporters to disclose confidential information outweighs any public interest in obtaining the source of such information.
To require Daily News reporter Raftery to respond to the subpoenas and subject himself to interrogation would perforce compel him not only to divulge his sources of information but to invite an open challenge to the right of newspapermen to write, edit and collect the news.
Here Raftery did not witness the commission of a crime. Had that been the case, and had he been subpoenaed by a grand jury or a court of law to testify to those observations, even if made during his news coverage of a story, he would enjoy no "privilege” whatsoever and a motion to quash in those circumstances would be denied.
It would appear from these affidavits and oral argument that the defense seeks testimony from Mr. Raftery for the sole purpose of impeaching the affiant police officers and himself, since he also denies that he had at one time admitted to defense counsel that he conferred with the arresting officers. A confrontation of this type would be both tangential and speculative in nature. Mr. Raftery claims no memory of the article. The use of Mr. Raftery’s lack of memory of an article he may or may not have written, in whole or in part, would appear to be too far removed from the issue of the existence of a confidential informant versus an anonymous tipster to be *644 material to this hearing. The information sought would not be of sufficient probative value or relevancy to warrant compelling the testimony sought here.
The attempt to use the reporter’s testimony for impeachment purposes on a collateral issue will entitle the reporter to First Amendment protection (State v St. Peter, 132 Vt 266; Brown v Commonwealth, 214 Va 755).
This court concludes that in this case and under these circumstances, the First Amendment protection should extend to the reporter in question, and he need not appear in this court to testify or to produce any notes or memos in relation to the news story in question.
SECTION 79-h OF THE NEW YORK STATE CIVIL RIGHTS LAW
In his supporting affidavit to the court, Raftery states that today, 11 months after the publication of the article, he could not testify that he wrote the article in its entirely or that all of the information in the article was given to him.
Parenthetically, it may be noted that nowhere in the reportorial account of the events appearing in the News edition of April 26, 1974 does the newsman reveal his sources of information leading up to the arrest. The specific naming of two police officers (Detective Gerald Gardella and Detective Sergeant William Friedlieb) in the article was limited to post-arrest information furnished by them only with reference to the items seized. If Mr. Raftery be now required to disclose his source of information as to who were the "Cops said, etc.”— true or untrue — he would be disclosing a source which he seeks to protect and which strikes at the very heart of section 79-h of the Civil Rights Law. That is precisely why newsmen use such terms of anonymity in their investigative reporting such as "reliable sources,” "undisclosed persons,” etc.
It was to enable newsmen to disseminate information to the public without fear of disclosing their sources of information that prompted the State Legislature to enact section 79-h of the Civil Rights Law, which provides in its pertinent parts as follows:
"§ 79-h. Special provisions relating to persons employed by, or connected with news media.
"(a) Definitions. As used in this section, the following definitions shall apply: * * *
*645 "(8) 'News’ shall mean written, oral or pictorial information or communication concerning local, national or worldwide events or other matters of public concern or public interest or affecting the public welfare.
"(b) Exemption of professional journalists and newscasters from contempt.
"Notwithstanding the provisions of any general or speciñc law to the contrary, no professional journalist or newscaster employed or otherwise associated with any newspaper, magazine, news agency, press association, wire service, radio or television transmission station or network, shall be adjudged in contempt by any court, the legislature or other body having contempt powers, for refusing or failing to disclose any news or the source of any such news coming into his possession in the course of gathering or obtaining news for publication or to be published in a newspaper, magazine, or for broadcast by a radio or television transmission station or network, by which he is professionally employed or otherwise associated in a news gathering capacity.” (Emphasis supplied.)
Absent such a law, news reporters would be at a distinct disadvantage in investigating and exposing to public view acts of crime, corruption and influence peddling in the public and private sector. Sources of news would evaporate and the public’s access to information would be drastically curtailed, if not entirely decimated.
Had Carl Bernstein and Bob Woodward of the Washington Post been obliged to disclose their many sources of information, the true story of Watergate might never have been exposed to the American people. "Good reporters are sleuths by nature, with an instinct for zeroing in on any and all promising leads * * * The Post team kept asking questions and scoring front-page scoops, one thing leading to another. Sometimes it was a casual remark dropped during an interview with a secretary of one of 'the President’s men.’ Again it was a tip furnished by a now-disenchanted member of the Committee for the Re-election of the President. Doubtless Bernstein’s and Woodward’s most effective source — codenamed 'Deep Throat’ — was a man high in the executive branch of the Federal Government, a man whose name they still protect and whom Woodward met at early morning hours in obscure corners of Washington. It was he who directed them with unerring accuracy to new developments in the sorry political spectacle then unfolding.” (John K. Hutchens in *646 his review of All the President’s Men appearing in the Book of the Month Club News.)
In an address before the Federal Bar Association of New York, New Jersey and Connecticut on November 24, 1965, Clifton Daniel, associate editor of the New York Times, said: "Newspapermen, of course, are not judges, but they are investigators, and to prevent the publication of the investigations would cost us a great deal in terms of the integrity of our public life.”
Since its enactment, section 79-h has not been extensively interpreted. Most cases arising under the statute (like most Federal cases, including Branzburg v Hayes, 408 US 665, supra) have been concerned with reporters’ eyewitness accounts of crimes to be furnished to a grand jury, or physical production of evidence to a grand jury or District Attorney after the entirety of such evidence had been publicly revealed. Thus, in Matter of Wolf v People (69 Misc 2d 256, affd 39 AD2d 864), production of an original signed manuscript of an article was ordered, the manuscript itself having been published and attributed to a named individual. And in Matter of WBAI-FM v Proskin (42 AD2d 5), the court held that a letter advising of a bomb threat which had been read over the air and released to the press was outside the scope of privilege.
Defendants rely upon the Wolf and WBAI cases (supra). A sober, clear and careful appraisal of the cases cited will lead to the inescapable conclusion that they are distinguishable from the case before the court.
The facts in the Wolf case (supra) can be summarized as follows: Prisoners in the Tombs rioted and thereafter one of them was indicted for kidnapping and coercion and other crimes allegedly committed in the riot. Subsequently, the Village Voice, a weekly newspaper, published an article on the riots, written by said prisoner, admittedly not a news reporter, in which he purportedly admitted his complicity. The article was published under the by-line of Ricardo de Leon, an inmate, who, along with other inmates, was indicted for kidnapping, coercion and.other crimes allegedly committed during the riots. The manuscript was transmitted during the riots to a Village Voice reporter covering the story, and after having been edited, it was published in the paper. The District Attorney served a subpoena duces tecum demanding the original manuscript.
In Wolf (supra), the newspaper publisher moved to quash *647 the subpoena on two grounds: first, infringement upon the freedom of the press as guaranteed by the First Amendment, and that " 'if persons interviewed know that the information they supply to newsmen is subject to subpoena, meaningful information simply will not be provided’ ” (69 Misc 2d 256, 257, supra); and, secondly, that section 79-h of the Civil Rights Law (L 1970, ch 615) confers upon newspapers and professional reporters a privilege to refuse to disclose or surrender the manuscript demanded.
There the court was not concerned with the plight of a newspaper reporter or journalist who sought to protect his anonymous sources of information (Matter of Caldwell, 311 F Supp 358; Matter of Caldwell v United States, 434 F2d 1081, cert granted 402 US 942), but with the question whether a newspaper or its reporter is privileged to withhold from a proper tribunal an alleged "confession” advertised as authored by a person under indictment.
In its denial of the motion to quash, the court (Mr. Justice Birns) ruled that petitioners could not avail themselves of the newsman’s privilege under section 79-h of the Civil Rights Law. The court held, at page 261, that "in order to raise successfully the claim of privilege, two essential elements must be established: first, the information or its sources must be imparted to the reporter under a cloak of confidentiality, i.e., upon an understanding, express or implied, that the information or its sources will not be disclosed; and second, that the information or its sources must be obtained in the course of gathering of news for publication.”
"Undoubtedly, the manuscript is 'news’ within the statutory definition. Assuming further that it was news coming into the journalist’s possession 'in the course of gathering or obtaining news for publication’, it was not obtained under the cloak of confidentiality the statute was designed to protect. Hence, petitioners are not entitled to raise the claim of privilege.
"One further point requires discussion. The representation by the Village Voice that the article in question was authored by Ricardo de Leon constitutes a waiver of any possible protection afforded by the statute. Publication of the article constituted a voluntary disclosure.” (69 Misc 2d 256, 257, supra.)
In affirming, the Appellate Division, First Department, held (39 AD2d 864, supra): "Nor do we believe that enforcement of the subpoena is violative of section 79-h of the Civil Rights *648 Law. That section merely protects the journalist 'for refusing or failing to disclose any news or the source of any such news’. But, as stated, the information sought by the subpoena has been published and the source revealed. The statute therefore, cannot be used as a shield to protect that which already has been exposed to view * * * Moreover, as held by Trial Term, the intent of the statute is that the privilege be afforded only where the information was received under the cloak of confidentiality. Such has not been demonstrated here.”
In the Matter of WBAI-FM v Proskin (42 AD2d 5, supra), the Appellate Division, Third Department, also affirmed a decision denying a motion to quash a subpoena. The appellant, a radio station, received an anonymous telephone call. The caller stated that a letter, advising of an imminent bomb threat, had been placed in a nearby phone booth. An employee of the station, a newscaster, proceeded to the designated spot and found the letter which stated that the "Weather Underground” was about to bomb the offices of the Commissioner of Correctional Services in the Twin Towers office building in Albany. The police were notified, the letter was read over the air, and its contents later released to all interested agencies. A bomb did explode as threatened, resulting in extensive property damage.
The appellant was served with a subpoena duces tecum which requested the production of the letter.
The Appellate Division held that the letter was outside the scope of the privilege since it was not a confidential communication. "We find no merit in appellant’s contention that, since 79-h does not explicitly state that the privilege applies only to confidential communications, no requirement of confidentiality exists. When section 79-h was signed into law by Governor Rockefeller, he cited the 'real and imminent threat’ of requiring 'the disclosure of information obtained by reporters in confidence.’ (NY Legis Annual, 1970, p 508). Furthermore, the statute has been interpreted to afford the privilege only where the information was received under a cloak of confidentiality. (See Matter of Wolf, 39 AD2d 864).” (42 AD 5, 6-7, supra.)
The court further added (p 7):
"Historically, each of the several privileges recognized by our statutes rests upon a confidential relationship. We recognize that these privileges are exceptions to the general rule which requires disclosure to an authorized governmental body and must therefore be strictly construed. Confidentiality is *649 here lacking. The author of the letter took pains to conceal his identity by signing the letter 'Weather Underground’, and to insure that appellant would obtain the letter without learning its author’s identity. Clearly, he was not willing to rely upon appellant to shield his identity from the authorities. He refused to establish a confidential relationship with appellant but preferred to talk with anyone who answered the phone.
"Moreover, since the letter was left in a public telephone booth where it might have been found by anyone and turned over to the police, it is clear that the author could not have been relying upon appellant to withhold the letter itself.”
In People v Dan (41 AD2d 687), a newscaster and a television cameraman refused to answer questions put to them before the grand jury. The asserted ground for such refusal was that they were protected by section 79-h of the Civil Rights Law and the First Amendment from disclosing any news or the source of any such news coming into their possession in the course of gathering or obtaining news for broadcast by the television station by which they were employed.
The court’s refusal to quash was affirmed by the Appellate Division (41 AD2d 687, 688, supra) on the ground that "The questions which they refused to answer did not require them to disclose news or the sources of their news, information or knowledge but merely asked them to testify about events which they had observed personally.” Under those circumstances they were denied the rights of newsmen to privileged communications under the First Amendment and section 79-h.
The facts in the Wolf, WBAI and Dan cases (supra) do discern a profound difference from the case before the court.
More akin, however, to the instant case is People v Bonnakemper (74 Misc 2d 696). There a motion to quash a subpoena duces tecum was granted. The defendant sought an order requiring the newspaper publisher to produce reporters and photographers employed by it, and photographs which they made on a certain day in the course of their news gathering. The court held that the newsman’s privilege statute (Civil Rights Law, § 79-h) accrues to the newsman’s publisher as well as to the newsman.
The court also stated as follows (p 698): "Now, we have one area regarding section 79-h of the Civil Rights Law that the court would like to mention and that is the possible waiver of immunities affordable under the law. That matter has been *650 touched on in these proceedings; but the court states that, in effect, if a person does publish photos in a newspaper journal, the question has been posed, does he, in effect, waive any immunity which may be afforded him under section 79-h and various subdivisions therein. This court makes a negative ruling, in that, even though voluntarily published in a newspaper, the photos are still the property of and the work product of an individual photographer employed by the corporate newspaper.”
Photo journalism is included in the over-all field of the press protected by the First Amendment and in the definition of "news” in section 79-h (subd [a], par [8]) of the Civil Rights Law.
The two-pronged test laid down by Mr. Justice Birns in Wolf (69 Misc 2d 256, affd 39 AD2d 864, supra), and adopted by the First Department, Appellate Division, in its affirmance of his decision is significantly present in this case. First, the information and its sources were imparted to the reporter under a cloak of confidentiality and, second the information or its sources were obtained in the course of gathering news for publication.
Here defendants are not seeking testimony concerning the observation of the commission of a criminal act. They are not seeking the production of a document which has already been published. What defendants seek is to compel testimony concerning "news or the source of news” directly contra to the newsman’s privilege enunciated by section 79-h of the Civil Rights Law.
It was solely on the basis of the affidavit submitted and the sworn testimony of the affiants acknowledging the facts outlined in the affidavit as true that the criminal court Judge caused a search warrant to be issued on April 24, 1974. Obviously the Judge did not and could not on April 24 have observed the facts of the seizure and arrest as reported in the Daily News two days later, specifically on April 26,1974.
In the very recent case of People v Barnes (Sup Ct, Bronx County, Index No. 3194/74), the defense subpoenaed reporters from three metropolitan newspapers to demonstrate that statements allegedly made by police to reporters were inconsistent with the officers’ testimony before the grand jury and at the suppression hearing. The facts in Barnes parallel those in the case at bar. Justice Joseph P. Sullivan held, as this court does here, that where the newspaper article in question *651 did not attribute a particular statement to an identified police officer, the reporter could not be questioned concerning the source of his information and could refuse to testify because of the privilege afforded under the First Amendment of the Constitution and section 79-h of the New York Civil Rights Law.
Generally, privileges in response to subpoenas ad testificandum may not be asserted in advance of questions actually propounded (Matter of Weiner, 183 Misc 267). However, in this case, where Raftery would be entitled to invoke the privilege of the First Amendment and the newsman’s shield law if asked to divulge the sources of his information that "Cops said that” (ibid.), we agree with petitioner that it would be a useless exercise to require him to take the stand.
For all of the foregoing reasons, petitioner’s motion to quash the subpoena and subpoena duces tecum is granted.