OPINION OF THE COURT
Hugh F. McShane, J.
Movant Pamela O’Shaughnessy, a news reporter for the Brooklyn newspaper Kings Courier, seeks an order of this court quashing both a subpoena ad testiñcandum and a subpoena duces tecum served upon her, alleging as authority for such remedy CPLR 2304, section 79-h of the Civil Rights Law *183 of New York, the First and Fourteenth Amendments to the United States Constitution, and section 8 of article I of the New York State Constitution.
Following the court’s order that the defendant show cause why the subpoenas should not be quashed, a plenary hearing on the issues raised was had on October 31, 1978.
The defendant-respondent has been indicted by the Grand Jury of Kings County charging him in a five-count indictment with criminal sale of a controlled substance in the first, second, and fifth degrees, and criminal possession of a controlled substance in the third and fifth degrees. The most serious charge in the indictment, a class A-l felony, would result in a mandatory minimum sentence of from 15 years to life imprisonment should defendant be convicted.
The subpoenas issued as the result of an article under movant’s by-line, published on page 3 of the Kings Courier of July 3, 1978, and discussing the alleged activities of an undercover police officer engaged in a series of police operations in the Brooklyn neighborhoods of Coney Island and Brighton Beach over a period of two years which were directed toward the investigation and arrest of drug suppliers and illegal gun dealers in those areas. The article in question purportedly quotes the undercover officer, its obvious protagonist, several times, including an alleged quotation wherein defendant was specifically identified by name.*
Defendant’s avowed purpose in serving the subpoenas was to have the reporter produce, upon the trial of the indictment, as called for in the subpoena duces tecum, her "notes, records, memorandum [sic], etc., all concerning a certain article and/or writings which appeared under your said name in the Kings Courier, concerning michael zagarino, and others mentioned thereon on or about the 3rd day of July, 1978, under title and capitón [sic] of 'Fourteen Major Dope Dealers Convicted In Series of Undercover Operations’ ”. Defendant further seeks to determine, from a review of the reporter’s notes or memoranda, whether the undercover officer’s testimony to be had at the trial of the indictment is inconsistent with what he related to the reporter concerning defendant, in order to *184 impeach the credibility of the officer before the jury, if possible.
During the hearing on the motion, defendant’s attorney pointed out four inconsistencies between the version of the events as outlined in the reporter’s article and the voluntary disclosure form served upon defendant by the District Attorney’s office. A voluntary disclosure form provides a defendant with the alleged details of the crimes charged; here, it states that the alleged sale of drugs took place at a "Big Daddy’s” restaurant at Avenue Y in Brooklyn, whereas the article indicates, as an apparent quote of the undercover officer, that the sale took place at Avenue Z. The article further indicates that the defendant was arrested on July 17, and the voluntary disclosure form indicates the arrest took place on July 15. In addition, the article indicates that the sale of a shipment of stolen guns (for which defendant has been convicted) was made during the 1977 blackout on July 17, whereas, in actuality the blackout took place on the night of July 13, 1977.
The fourth inconsistency alleged is that the newspaper article states that the stolen gun seizure was the biggest in the history of the New York City Police Department, whereas the seizure was made by Federal authorities rather than by city police.
While it is true that the only inconsistency which the newspaper article credits to the undercover officer, in quotation marks, is the location of the drug sale, the defendant naturally wishes to determine the source of the other alleged inconsistencies.
It is clear that the undercover police officer who allegedly dealt with defendant herein and brought about defendant’s arrest will be testifying as a prosecution witness at the trial. As is true in the majority of cases charging defendants with a sale or possession of controlled substances, this undercover officer will be the pivotal prosecution witness against the defendant, and his credibility will be a major issue of fact to be determined by the jury. In argument at the hearing, defendant has urged upon the court a violation of his Sixth Amendment constitutional right "to have compulsory process for obtaining witnesses in his favor”, if the movant were exempted from testifying should the subpoenas be quashed.
When first apprised of the ostensible struggle between the movant’s First Amendment rights and the defendant’s Sixth *185 Amendment rights, this court was put in mind of the prologue to Shakespeare’s Henry the Fifth, wherein the chorus, alluding to France and England, importunes the audience to
"Suppose within the girdle of these walls Are now confined two mighty monarchies,
Whose high upreared and abutting fronts The perilous narrow ocean parts asunder”.
For, in truth, a clash of the two "mighty monarchies”, the free press rights and the fair trial rights of Americans, seemed to be squarely presented for resolution. Further consideration of the issue, however, dissolves the spectre of such an Olympian confrontation. While a resolution of such a direct collision of the constitutional right of a defendant to a fair trial and the constitutional right of freedom of the press would present a provacative and stimulating task, upon the issue presented in the instant motion, such a charge is not assigned to this court.
cplr 2304
First, movant has chosen, under CPLR 2304, the correct forum wherein to bring a motion to "quash, fix conditions or modify a subpoena”. She has moved promptly, so that the issue presented by this motion can be resolved prior to the expected testimony of the undercover police officer. However, movant urges upon the court that the issuance of the process was an abuse of the subpoena power in that the subpoena duces tecum was overbroad. Her interpretation of the verbiage of the subpoena is that defendant is seeking her notes and memoranda concerning all 14 of the "major dope dealers” mentioned in the newspaper article.
As drawn, the court does not read the subpoena as seeking information concerning the undercover officer’s activities vis-ávis 13 other subjects of the article. It is apparent that movant has misread "notes, records, memorandum [sic] * * * concerning a certain article and/or writings * * * concerning Michael Zagarino, and others mentioned thereon” to include notes, records, and memoranda concerning Michael Zagarino and others, when, in fact, the phrase "concerning Michael Zagarino, and others mentioned thereon” modifies the antecedent "a certain article” and is not to be construed as calling for information other than that respecting defendant. Indeed, during argument defendant advised the court that his subpoena seeks such and no more. To permit defendant to require *186 the production of notes concerning other persons mentioned in the article would be making of the press an investigative arm for the defendant herein, something not contemplated as a proper purpose of process of the courts. Further, to broaden the scope of the subpoena duces tecum served upon movant would be to destroy the rationale for its issuance, i.e., to demonstrate inconsistencies in the testimony of the undercover officer, and this court will not participate in such a venture.
FREEDOM OF THE PRESS
Miss O’Shaughnessy urges upon the court her exemption, under an alleged reporter’s privilege, from responding to the subpoenas in question. No claim of improper service has been alleged. She argues, rather, that as a staff crime reporter she has developed confidential sources of information concerning crime in the geographical area of her work and beyond, and contends that to require that she appear at the trial of the indictment and produce her notes and memoranda concerning any information she may have received with regard to the defendant would be to violate the confidential relationship which formed the basis for procuring that information. Moreover, she asserts that the prime function of the press to gather and disseminate news to the public would be unalterably diminished and handicapped to the point where the First Amendment rights of freedom of speech and of the press would be violated. To force a reporter to testify in a public forum and reveal confidential sources of information would, she avers, dry up the flow of information from such sources since they could not then rely on their identity being kept secret.
The posture of the movant concerning her claim to privilege is not a novel one to come before the courts. There has been a multitude of cases in recent years where First Amendment freedom of the press claims have received wide publicity. Indeed, the hearing on the instant motion has already resulted in newspaper and television coverage; some of it, unfortunately, viewing the issue herein as a conflict between the courts and the press. This court does not perceive the issue here as creating such a divergence of interests, but subscribes to the view, as stated by the Supreme Court of the United States in Sheppard v Maxwell (384 US 333, 350) that "[A] responsible press has always been regarded as the handmai *187 den of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors and judicial processes to extensive public scrutiny and criticism.”
In addition to claiming a reporter’s privilege, movant further contends that to permit the subpoenas presently addressed to remain in force and effect would encourage a constant harassment of the press in criminal matters: defense attorneys, she states, would go on "fishing expeditions”, seeking favorable evidence by subpoenaing every reporter who might publish an article concerning the matters in which such attorneys represent defendants.
This court concurs that a rash of subpoenas seeking to breach the confidential relationships between journalists and their sources of information may very well be directed against the press in future criminal trials; however, there again, the press will always have access to the courts to remedy abuses of process on a utilitarian individual case basis. As Mr. Justice Powell states, in his concurring opinion in Branzburg v Hayes (408 US 665, 709-710):
"The solicitude repeatedly shown by this Court for First Amendment freedoms should be sufficient assurance against any such effort, even if one seriously believed that the media —properly free and untrammeled in the fullest sense of these terms — were not able to protect themselves.
"As indicated in the concluding portion of the opinion, the Court states that no harassment of newsmen will be tolerated.”
Clearly, the First Amendment of the United States Constitution does not explicitly address itself to the protection of confidential sources or an absolute privilege of the press to avoid testifying at trials when subpoenaed. The concept has arisen from a view that the freedom of the press would be attenuated by interference with the sources of news, thus violating the First Amendment’s constitutional protection of the press. The Supreme Court of the United States has addressed itself to this question of absolute privilege in Branzburg v Hayes (408 US 665, 667, supra) and has held that no such absolute privilege exists for the press when subpoenaed to testify before a Grand Jury: "The issue in these cases is *188 whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of speech and press guaranteed by the First Amendment. We hold that it does not.”
The view that a journalist is exempted from the effect of a subpoena attempting to extract confidential sources first came under judicial review in Garland v Torre (259 F2d 545), a civil case. Certiorari was denied by the Supreme Court (358 US 910). As noted by Mr. Justice White when speaking for the majority in Branzburg (supra, p 686) with reference to the claimed privilege in Garland, "this argument has been almost uniformly rejected since then, although there are occasional dicta that, in circumstances not presented here, a newsman might be excused.” Furthermore, after noting that, until Branzburg, the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against self incrimination, Mr. Justice White stated (Branzburg, 408 US 665, 690, supra), "We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.”
In addition, while sitting as a Circuit Justice, on an application to stay an order of the Supreme Court of New Jersey refusing to stay an order of the Superior Court of New Jersey holding the applicants in contempt in New York Times Co. v Jascalevich (439 US 1317) he stated, in denying the application, that "There is no present authority in this Court either that newsmen are constitutionally privileged to withhold duly subpoenaed documents material to the prosecution or defense of a criminal case or that a defendant seeking the subpoena must show extraordinary circumstances before enforcement against newsmen will be had.” (Citing Branzburg, 408 US 665, supra; and Zurcher v Stanford Daily, 436 US 547.)
It is clear to this court that there is no law of the land granting a First Amendment exemption to journalists to permit them to refuse to divulge confidential sources, at least insofar as appearing before a Grand Jury is concerned. Whether such exemption exists when a journalist is subpoenaed to testify for a defendant in a criminal trial is, as yet, unresolved, and the issue must be addressed on an ad hoc basis. Certainly, the so-called "shield” laws enacted by a number of States would indicate that the Legislatures in those *189 States are setting a trend favorable to the concept of such an exemption for the press.
In contrast, the Sixth Amendment of the Constitution of the United States guarantees an explicit right to a defendant "to have compulsory process for obtaining witnesses in his favor” which clause was made applicable through the due process clause of the Fourteenth Amendment in Washington v Texas (388 US 14). Chief Justice Warren, delivering the opinion of the court there (supra, pp 18-19) stated:
"The right of an accused to have compulsory process for obtaining witnesses in his favor stands on no lesser footing than the other Sixth Amendment rights that we have previously held applicable to the States.
* * *
"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant’s version of the facts as well as the prosecution’s to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution’s witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.” (Emphasis supplied.)
Moreover, Mr. Chief Justice Burger, when addressing a case of prior restraint, or "gag” orders, stated: "The authors of the Bill of Rights did not undertake to assign priorities as between First Amendment and Sixth Amendment rights, ranking one as superior to the other. In this case, the petitioners would have us declare the right of an accused subordinate to their right to publish in all circumstances. But if the authors of these guarantees, fully aware of the potential conflicts between them, were unwilling or unable to resolve the issues by assigning to one priority over the other, it is not for us to rewrite the Constitution by undertaking what they declined to do. It is unnecessary, after nearly two centuries, to establish a priority applicable in all circumstances. Yet it is nonetheless clear that the barriers to prior restraint remain high unless we are to abandon what the Court has said for nearly a quarter of our national existence and implied throughout all of it. The history of even wartime suspension of categorical guarantees, such as habeas corpus or the right to trial by civilian courts, see Ex parte Milligan, 4 Wall. 2 (1867), *190 cautions against suspending explicit guarantees.” (Nebraska Press Assn. v Stuart, 427 US 539, 561; emphasis supplied.)
As previously indicated, this court is not required, on the issue presented, to determine constitutional priorities between Sixth and First Amendment protections. The issue presented is one in which the doctrine of waiver obtains and the court restricts itself to such issue.
It is clear that a newspaper reporter may properly offer anonymity to another person who provides a source of news, a quid pro quo. The benefit to the reporter is the information received, which is published. The benefit to the source is the promise that his identity will not be revealed. As structured, the relationship protects the anonymity of the informant as the source of news, not the reporter.
If by testifying at a public trial the source of the news consents to the revelation of his identity, then he, and not the reporter, is waiving the benefit he derives from the compact. The reporter has already procured his benefit from the confidential relationship by receiving and publishing the information provided by the source.
This court does not discern wherein a reporter is aggrieved when the confidential relationship is dissolved by the party requiring the anonymity ab initio. The argument that revelation of a source to public view in such a case will affect the future structuring of such confidential reporter-anonymous source relationships is not tenable. News sources who desire anonymity may still provide information to journalists and maintain such a symbiotic relationship until they, the sources, decide to reveal their identities. To argue that they cannot waive the right of the reporter to continue to maintain such source’s anonymity in such a situation would be akin to Joshua directing the continued sounding of the priests’ horns at Jericho after its walls had collapsed. Similarly, to permit a reporter to refuse to respond to process of the courts, claiming exemption based on a confidential relationship when such confidentiality is no longer required by the source, would be, at the very least, fatuous. The court therefore finds that movant’s constitutional claim of exemption from the effect of process fails herein.
THE NEW YORK "SHIELD” LAW
In her supporting affidavit seeking to quash the instant *191 subpoenas, movant alleges that "the subpoena is barred by the Civil Rights Law”. In actuality, section 79-h of the Civil Rights Law of New York State, enacted in 1970 (L 1970, ch 615, eff May 12, 1970, amd L 1975, ch 316, eff June 24, 1975), concerns itself with contempt proceedings against journalists and newscasters.
The statute provides that a news reporter shall not be adjudged in contempt by any court, the Legislature, or any body having contempt powers for "refusing or failing to disclose any news or the source of any such news coming into his possession in the course of gathering or obtaining news for publication or to be published in a newspaper, magazine, or for broadcast by a radio or television transmission station or network, by which he is professionally employed or otherwise associated in a news gathering capacity”.
The legislative intent in creating the privilege contained in section 79-h of the Civil Rights Law was, quoting from the memorandum of the original proponent of the bill, Assemblyman Emeel S. Betras (NY Legis Ann, 1970, p 33): "protecting persons and news media from being called by investigative bodies or individuals and being forced to reveal the sources of their information on material which they have broadcast or published.”
Our Court of Appeals has not yet ruled on the legal perimeter or efficacy of this so-called "shield” law, although there have been limited interpretations by the lower courts. Indeed, the unconstitutionality of this statute, as a possible violation of the doctrine of separation of powers, has been alluded to in People v Monroe (82 Mise 2d 850). Whether the statute is a legislative encroachment upon the powers of the judiciary department of this State to control and define its processes is not an issue this court discerns to be addressed at bar, nor has it been urged by any party as vital to the resolution of this dispute. Further, whether the statute creates a conflict between sections 8 and 6 of article I of the New York State Constitution has yet to be resolved. Article I of New York’s Constitution, the bill of rights óf this State, parallels the due process rights and freedom of speech and press rights set forth in the Federal Constitution. Judicial restraint requires this court to avoid any attempt at resolution of such a conceivable State Constitution disharmony in the matter at bar.
The Appellate Division of the First Department considered section 79-h of the Civil Rights Law in Matter of Wolf (39 *192 AD2d 864) wherein the subpoena issued sought the original manuscript of an article published in The Village Voice, the manuscript itself having been published and its authorship attributed to one Richardo De Leon. Since the article published in the newspaper had already revealed the source of the manuscript and since it had not been received under a cloak of confidentiality, both the Supreme Court and the Appellate Division decided that publication of the article and the author’s identity constituted voluntary disclosure and refused to exempt the newspaper from responding to the subpoena. However, when referring to the potency of section 79-h in Wolf, the Appellate Division stated (supra, p 864): "The statute therefore, cannot be used as a shield to protect that which has already been exposed to view”.
In addition, this court distinguishes the issue at bar from People v Marahan (81 Misc 2d 637) cited by movant. There, the identity of the confidential source had not been revealed, as it is projected to be in the instant case. Further, in Marahan, the court pointed out that the reporter therein claimed in an affidavit that he had no memory of the article published and that the confrontation sought was both tangential and speculative in nature. Moreover, in Marahan the court cited and quoted from Matter of Dan v Simonetti (80 Misc 2d 399) in respect to the sacred rights of the First Amendment and its proper balancing with the fair administration of justice; Dan may also be distinguished from the matter before this court in that Dan did not involve a confidential source of news. Nevertheless, it is clear that in Matter of Dan (supra, p 401) the court did note that "[privileged communications have the element of confidentiality between the person holding the privilege and the person to whom the communication is made, which can be waived(Emphasis supplied.)
Therefore, since it is expected that the identity of the source of news in the case at bar, i.e., the undercover police officer, will be revealed and that his activities surrounding the investigation and arrest of the defendant necessarily will be part and parcel of the prosecution’s case against the defendant, and since, obviously, it was not the intent of the Legislature in enacting the "shield” law to "protect that which has already been exposed to view”, the court finds that movant’s claim of exemption from possible contempt proceedings under *193 section 79-h of the Civil Rights Law of New York must also fail.
Finally, Miss O’Shaughnessy, both in her affidavit in support of the motion and in oral argument, alleges that the article in question "is a composite of material told to me by more than one source, some of whom, in my estimation, can be identified from the 'quotation’ itself’. A fair and evenhanded perusal of the news article as published would, however, lead the average reader to conclude that it was composed after an interview with a single individual, the undercover officer. Indeed, a number of statements contained in quotation marks are patently attributable to him. While it may well be that Miss O’Shaughnessy edited information received from others in addition to that received from the undercover officer, and set up the article in the form printed for heightened drama, the court will necessarily resolve, if such a point in the proceedings is reached, which statements and information can be properly credited to the undercover officer.
In conclusion, the movant has failed to meet the burden of persuasion she must meet to quash the subpoenas served upon her, and the motion to quash is denied in all respects.
The court makes the following preliminary rulings concerning future procedures in the trial of the indictment:
1. The subpoenas served upon the movant herein shall continue in full force and effect and said movant shall hold herself available for possible testimony and production of her notes and memoranda respecting the defendant.
2. Following the testimony of the undercover police officer and after argument, the court will determine whether inconsistencies between such testimony and the information concerning the defendant attributed to the undercover police officer have been revealed and whether they are material and relevant.
3. If such material and relevant inconsistencies are revealed, the court will then require the movant to produce her notes and memoranda concerning the information she received from the undercover officer respecting the defendant for an in camera inspection by the court.
4. Should such an in camera inspection be had and the court rule that the notes and memoranda do give rise to defendant’s Sixth Amendment right to produce testimonial inconsistencies before the jury, the court will require movant *194 to testify concerning these notes and memoranda under pain of contempt for a willful refusal to testify.
5. If there are no material and relevant inconsistencies elicited during the testimony of the undercover police officer the subpoenae will be quashed forthwith.

 "When things got quiet, I decided to work on a new coke connection. I was supposed to meet a guy at Coney Island Avenue and Avenue Z to cop a V4 ounce of coke. I meet up with a guy named Mike Zaggarino and before long our investigation was taking us into Staten Island to purchase a shipment of stolen guns,” the narc told a reporter.