In the Matter of WBAI-FM, Appellant, *v.* ARNOLD W. PROSKIN, as District Attorney of Albany County, Respondent.

Third Department, June 7, 1973.

*Rhonda Copelon Schoenbrod* and *Peter Weiss* for appellant.

*Arnold Proskin, District Attorney,* in person (*John A. Williamson, Jr.* of counsel), for respondent.

*Jeremiah S. Gutman* for New York Civil Liberties Union and others, *amici curiae.*

*Per Curiam.* This is an appeal from an order of the County Court of Albany County, entered December 10, 1971, which denied appellant's motion to quash a subpoena duces tecum.

On September 17, 1971 appellant, a radio station located in New York City, received an anonymous telephone call. The caller stated that a letter, advising of an imminent bomb threat, had been placed in a nearby phone booth. An employee of the station, a newscaster, proceeded to the designated spot and found the letter which stated that the '' Weather Underground '' was about to bomb the offices of the Commissioner of Correctional Services in the Twin Towers Office Building in Albany. The police were notified, the letter was read over the air, and its contents later released to all interested news agencies. A bomb did explode as threatened, resulting in extensive property damage.

On October 11, 1971 appellant was served with a subpoena duces tecum which requested the production of the letter. Appellant, pursuant to CPLR 2304, instituted this proceeding to quash the subpoena claiming that it was privileged under the provisions of section 79-h of the Civil Rights Law. The issue is whether the letter in question is a privileged news source within the meaning of subdivision (b) of section 79-h of the Civil Rights Law.

We agree with that portion of the County Court's decision which held that the letter was outside the scope of the privilege since it was not a confidential communication. We find no merit in appellant's contention that, since section 79-h does not explicitly state that the privilege applies only to confidential communications, no requirement of confidentiality exists. When section 79-h was signed into law by Governor Rockefeller, he cited the '' real and imminent threat '' of requiring '' the disclosure of information obtained by reporters in confidence ''. (N. Y. Legis. Annual, 1970, p. 508.) Furthermore, the statute

has been interpreted to afford the privilege only where the information was received under a cloak of confidentiality. (See *Matter of Wolf*, 39 A D 2d 864.)

Historically, each of the several privileges recognized by our statutes rests upon a confidential relationship. We recognize that these privileges are exceptions to the general rule which requires disclosure to an authorized governmental body and must therefore be strictly construed. Confidentiality is here lacking. The author of the letter took pains to conceal his identity by signing the letter "Weather. Underground ", and to insure that appellant would obtain the letter without learning its author's identity. Clearly, he was not willing to rely upon appellant to shield his identity from the authorities. He refused to establish a confidential relationship with appellant but preferred to talk with anyone who answered the phone.

Moreover, since the letter was left in a public telephone booth where it might have been found by anyone and turned over to the police, it is clear that the author could not have been relying upon appellant to withhold the letter itself.

Finally, appellant urges that the District Attorney has not demonstrated a need for the subpoena, wherefore it should be quashed. We disagree. The letter is sought as an aid to investigation of a serious crime, which is a sufficient basis for requiring it to be turned over to the authorities where not barred by statutory privilege.

The order should be affirmed, with costs.

Cooke, J. (dissenting). I dissent and vote for reversal. Plaintiff's motion to quash the subpoena duces tecum should be granted.

Subdivision (b) of section 79-h of the Civil Rights Law provides: " no professional journalist or newscaster employed or otherwise associated with any newspaper * * * radio or television transmission station or network shall be adjudged in contempt by any court, the legislature or other body having contempt powers, for refusing or failing to disclose *any news or the source of any such news* coming into his possession in the course of gathering or obtaining news for publication " (emphasis supplied). Paragraph (8) of subdivision (a) of said section defines " news " as " written, oral or pictorial information or communication concerning local, national or worldwide events or other matters of public concern or public interest or affecting the public welfare." The previous paragraph states the meaning of " newscaster " as " a person who, for gain or livelihood,

is engaged in analyzing, commenting on or broadcasting, news by radio or television transmission.''

Section 79-h is extremely broad in its express terminology. It makes no distinction between actively and passively acquired '' news '', and it protects '' any news or the source of any such news coming into his [the professional journalist's or newscaster's] possession in the course of gathering or obtaining news for publication or to be published ''. The word '' any '' is significant, since it has been defined judicially to mean '' all '' and '' every '' and the use of the word imports no limitation (*Randall* v. *Bailey*, 288 N. Y. 280, 285; *Matter of Beach*, 154 N. Y. 242, 247; *Matter of Singer [State Laundry Co.]*, 189 Misc. 150, 151, affd. 273 App. Div. 755; *Matter of Schuster*, 111 Misc. 534, 538).

To hold, as did the decision under review, that the statute's protection is available only when the news agency itself initiates the quest for the information would emasculate the purpose of the statute and is erroneous. First, there is no statutory requirement, express or implied, that the news media must affirmatively gather the information in order to acquire the protection of the statutory shield. Second, no logical distinction can be drawn between affirmatively gathered news and that received passively from other sources. To limit the statutory protection to sources obtained in the course of a medium's own investigation ignores reality in that a large number of news items are initiated by information gratuitously supplied by third parties; for example, leaks concerning corruption or wrongdoing by persons desiring anonymity in order to protect their employment or safety. If section 79-h is not interpreted to cover these news sources, the very evil the statute was aimed at preventing, the drying up of news sources and the subsequent adverse effect on a free press would occur.

The Legislature in passing this newsman's shield law has made a policy decision that the interest of the public will be best served by allowing newsmen to protect their sources even if such action impedes a criminal investigation (see N. Y. Legis. Annual, 1970, p. 33; p. 508). *Matter of Taylor* (412 Pa. 32, 41), cited in the Governor's Memorandum and which construed the weaker Pennsylvania shield law, held: '' However, we are convinced that the public welfare will be benefitted more extensively and to a far greater degree by protection of all sources of disclosure of crime, conspiracy and corruption than it would be by the occasional disclosure of the sources of newspaper information concerning a crime!'' Although a balancing test

of the competing private and public interests involved has been omitted from the very broad terms of the statute, even were such a test to be applied here, appellant's rights clearly would be paramount in view of the statement in respondent's brief, which compels the conclusion that, at least according to respondent's definitional terms, nothing further would be revealed by the letter. (At page 5 of respondent's brief it is stated: '' Nor has Appellant shown that anything further will be revealed by furnishing the original letter, *since the source and contents have already been revealed* '' [emphasis supplied].) The situation under an all-inclusive statutory shield law should not be confused with those First Amendment constitutional cases which have considered a balancing of interests.

That the section protects both the identity of persons who are the source of the news and the actual information communicated is clear not only from the statute itself but also from the Governor's Memorandum which states : '' The bill protects journalists and newscasters from charges of contempt in any proceeding brought under State law for refusing or failing to disclose *information* or *sources of information* obtained in the course of gathering news for publication '' (N. Y. Legis. Annual, 1970, p. 508 [emphasis supplied]). Requiring a newsman to turn over a document which could be used to establish the personal identity of his source is tantamount to directly ordering him to reveal the name of his source. The case law is not to the contrary. Significantly, *People* v. *Dan* (41 A D 2d 687) held that a newscaster and television cameraman were required to testify about events which they observed personally, including the identity of the persons whom they observed, with which decision issue is not taken. In *Matter of Wolf* (39 A D 2d 864, *supra*), involving a definitely distinguishable situation, the First Department stated that, since there the information sought by the subpoena has been published and the source revealed, the statute could not be used as a shield to protect what had already been exposed to view. Here, the source is not disclosed.

The entire thrust of section 79-h is aimed at encouraging a free press by shielding those communications given to the news media in confidence. Before the communication can be shielded, it must be shown that it was imparted under a cloak of confidentiality upon an understanding, express or implied, that either the information or its sources, or both, would not be revealed, as the case might be. Appellant was never given the identity of the person who telephoned about the letter, the letter itself was not signed by any identifiable person or legal entity and the very

scheme adopted for communicating the letter reveals a deliberate intention not to reveal the author's personal identity. All these circumstances yield but one possible conclusion: that the author of the letter did not want his personal identity revealed and, therefore, that the letter was communicated under an implied understanding of confidentiality. To force appellant to turn over the letter so that the author's identity may be discerned from it would make it possible to discover the source's identity just as would an order directing it to divulge the name of a source who expressly requested anonymity.

Even if one were to be in disagreement with the wisdom of the policy underlying section 79-h and no matter how heinous the crime under investigation, the courts are not free to ignore the mandate of the Legislature and substitute a policy of their own.

HERLIHY, P. J., GREENBLOTT, MAIN and REYNOLDS, JJ., concur in *Per Curiam* opinion; COOKE, J., dissents and votes to reverse in a separate opinion.

Order affirmed, with costs.