Joseph D. Quinn, Jr., J.
In these criminal actions, applications to quash subpoenas ad testificandum served on behalf of defendants upon two newspaper reporters, as well as a subpoena duces tecum served upon a television station, present questions of (1) whether the protection afforded to the function *852 of news gathering under the freedom of the press clause of the First Amendment amounts to a testimonial privilege exempting newsmen from the compulsory revelation of confidential news sources or information at trial or hearing in a criminal case, (2) whether such a privilege exists under the liberty of the press clause of section 8 of article I of the New York Constitution, or under New York’s Shield Law (Civil Rights Law, § 79-h), and (3) whether defendants have succeeded in showing their right to the reception of the evidence sought by the various subpoenas issued here or that their need for such evidence surmounts other constitutional or statutory considerations which safeguard the press.
Each of the defendants here has been indicted on a felony gun possession charge. Each of these charges stems from an incident which occurred in The Bronx during the early hours of the morning of December 17,1974, when, following the stop of a motor vehicle for a trafile violation, police arrested Leroy "Nicky” Barnes, the driver of the stopped automobile and a notorious figure in the illegal drug trade, on bribery charges involving some $133,000 in cash which was found in the stopped car and eventually seized. Defendants were passengers in the car and they are said to be Barnes’ bodyguards. They were arrested with Barnes.
The arrests, and especially Barnes’, were widely publicized in the print and broadcast news media, and coverage of the incident was given by the New York Times, the New York Daily News, the New York Post, ABC television, NBC television, CBS television and most other television and radio stations serving the metropolitan area. In connection with this widespread publicity, several police officers, now prosecution witnesses, were interviewed by reporters for the various newspapers and broadcasting stations and were later quoted or photographed in news releases.
Barnes was the first of the trio brought to trial. At the time that his case came on for a suppression hearing and trial, his attorneys, who also represent defendants, subpoenaed each of the moving parties here as well as other newsmen and news organs. Materials such as notes, memoranda and unused or "outtake” television tapes, relating to the interviews with the officers, were also subpoenaed. The stated purpose for issuance of the subpoenas in the Barnes case (People v Barnes, Bronx County, Indictment No. 3194/74) was to obtain evidence of an impeaching nature to attack the credibility of the police *853 officers testifying for the prosecution there. The defense averred that the officers had made prior statements to the reporters, at the time of the interviews last December, which were inconsistent with subsequent Grand Jury testimony or hearing testimony given by the officers.
In the Barnes case, the subpoenas were resisted on claims of immunity and testimonial privilege for members of the fourth estate under the First Amendment of the Federal Constitution, the New York Constitution and the New York Shield Law. Additionally, the press urged lack of relevancy and materiality of the evidence sought and the lack of foundation for its reception. In Barnes, the quashing applications were granted by the Trial Judge on the last two grounds. Barnes was acquitted after a jury trial.
The instant indictments were consolidated for purposes of an evidentiary hearing held relative to motions by defendants to suppress certain tangible and intangible evidence. Again, the subpoenas went out to the press, and quashing applications followed, bottomed on the same grounds urged in Barnes. Near the close of a lengthy suppression hearing, this court granted the motions to quash the subpoenas for both the hearing and the trials which were to ensue, with the understanding of counsel that this formal opinion and order would be filed shortly.
In granting this relief, this court rejects any argument, express or implied, that the movants enjoyed testimonial privilege under the freedom of the press clause of the First Amendment which would immunize them, on the basis of their involvement in the news-gathering function, from the obligation, which is every citizen’s, to appear and testify in response to a subpoena issued on behalf of a party to a hearing or a trial of a criminal case.
Defendants do not say that either of the individual applicants observed the criminal conduct charged here, nor have they ever maintained that any newsman from the affected television station ever gained such first-hand knowledge. On argument, movants openly acknowledged that the several police officers who were interviewed were the sources of a goodly portion of the reported articles or newscasts. But, they reasoned, and not without some logic, that, if every time a crime reporter sought news information from a policeman, he became a potential witness to his own interview, and, thus, subject to call to give testimony assailing the credibility of the *854 officer, the police would soon decline to be questioned by the press, with the result that the public would be deprived of the very sort of reporting that served it best.
Similar and even stronger pleas for testimonial immunity were made by the press to the United States Supreme Court, in Branzburg v Hayes (408 US 665), but those pleas were speedily dispatched by the majority of that court. The Branzburg court laid to rest the notion that newsmen were entitled to either a conditional or an absolute testimonial privilege under the free press clause of the First Amendment. The majority holding in Branzburg is controlling in the cases at bar. Granted, Branzburg dealt in the main with Grand Jury investigations and the confidentiality of news sources rather than criminal hearings and trials and the confidentiality of news information. Nevertheless, the rule enunciated there is equally applicable to the secrecy of news information and to criminal proceedings. (Cf. United States v Liddy, 354 F Supp 208, 213; Brown v Commonwealth of Va., 214 Va 755.)
The court also turns down applicants’ claim of privilege predicated upon the liberty of the press clause of section 8 of article I of the New York Constitution. That clause, like the free speech clause, is a part of the New York Bill of Rights. In general, it mirrors the freedom of the press clause of the First Amendment. There is no reason to believe that this area of the State Constitution should be construed to confer a testimonial privilege not available under the related Federal provision from which it was derived. Were this not so, it is highly improbable that the Legislature would have gone to the lengths that it did to enact the so-called New York Shield Law, a measure seemingly calculated to protect journalists from the consequences of withholding anonymous news sources and information, which are not, according to the highest court in the land, constitutionally beyond the reach of judicial process.
But this draws into focus the purported statutory reportorial privilege which movants say, beyond all else, dictates the quashing of defendants’ subpoenas. First enacted in 1970 (L 1970, ch 615, eff May 12, 1970) as section 79-h of the Civil Rights Law, the measure is popularly known as the Shield Law. The original legislation provides, in substance, that a journalist or newscaster shall not be adjudged in contempt by any court, the Legislature or any body having contempt powers, for f<refusing or failing to disclose any news or the *855 source of any such news coming into his possession in the course of gathering or obtaining news for publication or to be published in a newspaper * * * or for broadcast by a radio or television transmission station or network, by which he is professionally employed or otherwise associated in a news gathering capacity. ”
Couched in negative language, this legislation cannot be accurately said, in a positive sense, to create a privilege exempting reporters from complying with compulsory process in trials and hearings. It does, however, avowedly protect those members of the press who assert such a privilege from liability to the sanction of contempt.
This court does not interpret this statute as granting the immunity claimed by the movants in these cases. To do so would be to hold that the First Amendment right to gather and publish news is paramount to the rights of an accused in a criminal case to due process, a fair trial and to have compulsory process to obtain evidence in his favor. Such a holding would ignore the controlling precedent of the United States Supreme Court which the court is bound to follow. (Cf. Larkin v Putnam's Sons, 14 NY2d 399, 404.)
There is no need in these actions to decide whether the Shield Law represents an unconstitutional interference by the Legislature with the contempt powers of the courts and, hence, whether it violates the principle of separation of powers. (But see Farr v Superior Ct. of Los Angeles County, 22 Cal App 3d 60, 69-70, cert den 409 US 1011.) Nor is there any necessity to pass upon the constitutionality of this enactment to the extent that it appears to give reporters testimonial privilege in defiance of the ruling in Branzburg. Even so, it does seem appropriate to call attention to the fact that a recent amendment of this law casts its validity in greater doubt than ever before.
In its current session, the Legislature has expanded the restrictions of this section against contempt adjudications by providing, in substance, that no Grand Jury shall seek to have a newsman held in contempt for asserting the reportorial privilege. (L 1975, ch 316, eff June 24, 1975.) This addition gives every appearance of a design to overrule Branzburg by legislative fiat. It turns a deaf ear to Mr. Justice White’s warning in Branzburg that State Legislatures are free to fashion their own rules and standards governing the newsman’s privilege, so long as they stay "within First Amend *856 ment limits". (Branzburg v Hayes, 408 US 665, 706, supra; emphasis supplied.)
Notwithstanding all of this, this court is of the opinion that there resides within the First Amendment and its freedom of the press clause an inherent right of confidentiality which attaches to the gathering and reporting of the news and which, to a degree, shelters both that process and those who pursue it as a calling. This belief springs from the knowledge that ours is a government based upon and supported by public opinion.
In our type of Government, the citizenry is the final judge of the proper conduct of the business of Government. "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government”. (Cf. Cox Broadcasting Corp. v Cohn, 420 US 469.) A free press, protected by a moderate amount of privilege of confidentiality of news information and source, insures a free flow of information to the people, and is indispensable to the continued maintenance of our form of Government. Ultimately, then, the doctrine of freedom of the press serves to benefit the people, not the news media. (Cf. United States v Powell, 171 F Supp 202, 205.)
As we see it, this right of confidentiality does not rise to the level of an exemption from testimonial compulsion. Rather, it is a factor which must be taken into account whenever it comes into conflict with the demand of a party for production of evidence in a judicial proceeding. In a criminal case, such a clash calls for a weighing of the claim to the privilege against the obligation of all citizens to give testimony. If the latter is found to be superior, then the former must give way to it. For example, this privilege must yield to the Government’s right to investigate and prosecute crime and to the right of an accused to defend himself and to have due process and a fair trial.
But the "[privilege of confidentiality should yield only when the defendant’s need is essential to a fair trial. Whether the need is essential to due process must be determined from the facts and circumstances in each case. * * * [W]hen there are *857 reasonable grounds to believe that information in the possession of a newsman is material to the proof of any element of a criminal offense, or to the proof of a defense asserted by the defendant, or to a reduction in the classification or gradation of the offense charged, or to a mitigation of the penalty attached, the defendant’s need to acquire such information is essential to a fair trial; when such information is not otherwise available, the defendant has a due process right to compel disclosure of such information and the identity of the source; and any privilege of confidentiality claimed by the newsmen must, upon pain of contempt, yield to that right. See, Vermont v St. Peter, Vt., 315 A 2d 254 (1974).” (Brown v Commonwealth of Va., 214 Va 755, supra.)
At bar, defendants’ quest is for alleged prior inconsistent statements made by prosecution witnesses, all policemen, to representatives of the news media. In spite of the latitude given to defense counsel, the lengthy record in the suppression hearing demonstrates that, in the main, there was a failure on defendants’ part to lay a proper foundation for the reception of such impeachment evidence. In the very few instances where some semblance of a foundation was put down, the inconsistent statements uncovered were not material to the proof of the crimes, the proof of any potential defenses, or to the reduction of the classification or penalties related to the offenses charged. Thus, the inconsistent statements were collateral to the issues, and the information in the hands of the media was irrelevant.
Furthermore, these statements were repetitious of and cumulative to similar matter elicited from nonpress sources. In this regard, it is noted that, on argument, defense counsel conceded, and virtually boasted, that, during the course of the suppression hearing, numerous inconsistencies between the testimony of the several police officers called to the stand had been brought to light during the process of both direct and cross-examination.
Under these circumstances, the privilege of confidentiality must prevail over the rights of the defendants to attempt to impeach the prosecution’s witnesses.
Accordingly, the quashing motions are granted for all purposes.