OPINION OF THE COURT
Lyman H. Smith, J.
Petitioner, a journalist employed by the Syracuse Post Standard, moves to quash a subpoena ad testificandum served on him by the Special Prosecutor of Onondaga County directing him to appear and testify before the Onondaga County Extraordinary Special Grand Jury.
Concededly, the testimony sought by the subpoena will pertain to conversations and interviews the petitioner had with two individuals in March, 1976, concerning certain contracts and payments made thereunder to two contractors for repair of the Salina Town Hall during the spring of 1976 — a subject currently under investigation by the Special Grand Jury.
The solicited testimony is clearly relevant to the ongoing investigation of the Special Grand Jury and falls within the ambit of Executive Order Nos. 42 and 43 (9 NYCRR 3.42, 3.43). There is not dispute that the conversations and interviews with the afore-mentioned individuals were predicate sources for prospective news stories and comments to be published in the Post Standard which, however, never went into print.
*413 Petitioner claims protection under the First Amendment (US Const) and its counter part, section 8 of article I of the New York Constitution. Likewise, petitioner seeks the protection of New York’s "Shield Law”, so-called (Civil Rights Law, § 79-h; L 1970, ch 615).
While recognizing the reportorial immunity from judicial contempt powers under the Shield Law (Civil Rights Law, § 79-h), the Special Prosecutor contends that the elements of confidentiality necessary to raise the shield of the statute is lacking in the instant case and that the motion to quash must therefore be denied. Commendably, the Special Prosecutor has acknowledged that conversations between the petitioner reporter and a third individual concerning the affairs of the Town of Salina were, in fact and in law, confidential and, by virtue of section 79-h, are beyond the reach of his subpoena ad testiñeandum.
Because of potential calumny and harm that might arise in open court, (1) from revelation of the afore-mentioned conversations and interviews, (2) from specific identification of otherwise statutorially privileged news sources, and (3) from possible publication of unfounded accusations against innocent persons, the court has conducted an in camera hearing, in which petitioner, his attorney, and two attorneys from the Special Prosecutor’s office have testified, outside of each other’s presence, concerning the circumstances surrounding the subject conversations and interviews. They have also testified concerning two meetings of the petitioner with the Special Prosecutor and others at the prosecutor’s office on October 7 and 13, 1977, when the investigation of the affairs of the Town of Salina was discussed.[1]
The in camera testimony of petitioner has established that in March, 1976, the petitioner reporter was approached by an individual, herein designated as "C”, who proffered information regarding purported official improprieties in the affairs of the Town of Salina on express condition that his ("C’s”) identity be kept confidential. Further, "C” provided petitioner with copies of certain public records of the Town of Salina which the reporter has since returned. These conversations between petitioner and "C” are not solicited under the instant subpoena. As above indicated, the Special Prosecutor concedes *414 that the reporter’s conversations and interviews with "C” are privileged under the statute. (Civil Rights Law, § 79-h.)
"C”, however, persuaded another individual, herein designated "A”, to meet one evening in the kitchen of "C’s” home with "C” and petitioner present to discuss the alleged improprieties. Petitioner had previously and independently sought such information from "A” and had been refused until "C’s” intercession with "A” succeeded in bringing about the aforementioned meeting in "C’s” home. No mention was made at this latter meeting regarding the preservation of "A’s” identity, nor of maintaining the confidentiality of the substance of their discussion. Petitioner frankly states that none was offered and none was requested.
Both sides agree that the other conversation, or interview, solicited by the subject subpoena, was held between petitioner and an individual identified only as "B”. Petitioner’s in camera testimony suggests that "B” was a close friend of petitioner and that the specific conversation or interview took place in the Salina Town Hall on an occasion when both petitioner and "B” were present and preoccupied with other business. According to petitioner his conversation with "B” lasted for only a brief time; that other persons were in the area, but none within earshot. Petitioner testified that it was fair to state on this occasion that "B” could probably have assumed that he, petitioner, had previously talked with "A” and "C”. Petitioner also stated that, while "B” did not volunteer information, or speak "freely”, he ("B”), nevertheless, answered petitioner’s inquiries directly and without hesitation. Again, in this instance, petitioner confirmed that no express request was made by petitioner for preservation of "B’s” identity, nor for maintenance of confidentiality of the substance of their conversation. As was the case with "A”, petitioner also confirmed that he did not offer such protection to "B”.
The attorneys for the Special Prosecutor’s office revealed to the court, in camera, that the petitioner, in their meeting with him on October 7, 1977, acknowledged to them the identities of "A”, "B” and "C”, insisting upon the confidentiality of his conversations with "C”, but not rejecting the contention that his conversations with "A” and "B” weré nonconfi *415 dential. They also testifed that "A” has since voluntarily met with them and discussed his conversations in the spring of 1976 with petitioner.[2]
It is within the purview of the foregoing circumstances that petitioner moves to quash the subject subpoena.
Petitioner’s motion to quash the subpoena is bottomed on the following contentions: (1) that the reporter’s privilege is total and absolute, having its genesis in the freedom of the press, guaranteed by the First Amendment (US Const), to gather and disseminate news and which right may only be effectively protected by guarantee of the anonymity of news sources; (2) that the statutorial privilege provided by New York’s Shield Law (Civil Rights Law, § 79-h) is well defined and is solely owned by the reporter; (3) that, in any event in the instant case, the testimony sought from the petitioner will be cumulative and is solicited solely for the purpose of bolstering the credibility of other witnesses who have previously testified, or may subsequently testify, before the Special Grand Jury.
These contentions will be considered seriatim.
CONSTITUTIONAL PROTECTION
 Branzburg v Hayes (408 US 665) is dispositive of petitioner’s first contention. (See Matter of Wolf v People, 69 Misc 2d 256, affd sub nom. People v Wolf, 39 AD2d 864; People v Marahan, 81 Misc 2d 637; and Matter of Cepedi, 233 F Supp 465.) The United States Supreme Court in Branzburg carefully considered, and rejected, the proposition that the First Amendment creates an absolute guarantee of anonymity of news sources. "[T]he great weight of authority is that newsmen are not exempt from the normal duty of appearing before a Grand Jury and answering questions relevant to a criminal investigation” (Branzburg v Hayes, supra, p 685).
In passing, it should be noted that Branzburg does not hold that newsmen subpoenaed to testify before a Grand Jury are without constitutional rights with respect to the gathering and dissemination of news or in safeguarding their sources, but rather, always have access to the courts to quash subpoenas and for appropriate protective orders to guard, on the one
*416 hand, the right to gather and disseminate news and, on the other hand, to maintain confidential in certain circumstances the identity of their news sources, including the substance of the gathered news.[3]
Absent a showing in the instant case, and there is none, that the instant Special Grand Jury investigation has been impaneled or conducted other than in good faith, or that the subpoena constitutes impermissible harassment of the petitioner newsman for purposes other than licit law enforcement, petitioner’s claim of Federal constitutional privilege must fail. By a parity of reasoning, petitioner’s conclusory claim of constitutional protection under section 8 of article I of New York’s Constitution must also fail. (See People v Wolf, supra; Branzburg v Hayes, supra.)
THE SHIELD LAW
Petitioner’s second contention is to the effect that the information and its sources have been imparted to him in a "confidential investigation”, have not been published, and must therefore, be privileged under the Shield Law.
Section 79-h of the New York Civil Rights Law reads in pertinent part:
"(a) Definitions. As used in this section, the following definitions shall apply:
"(1) 'Newspaper’ shall mean a paper that is printed and distributed ordinarily not less frequently than once a week, and has done so for at least one year, and that contains news, articles of opinion (as editorials), features, advertising, or other matter regarded as of current interest, has a paid circulation and has been entered at United States post-office as second class matter * * *
"(6) 'Professional journalist’ shall mean one who, for gain or livelihood, is engaged in gathering, preparing or editing of news for a newspaper, magazine, news agency, press association or wire service * * *
"(8) 'News’ shall mean written, oral or pictorial information or communciation concerning local, national or worldwide *417 events or other matters of public concern or public interest or affecting the public welfare.
"(b) Exemption of professional journalists and newscasters from contempt.
"Notwithstanding the provisions of any general or specific law to the contrary, no professional journalist or newscaster employed or otherwise associated with any newspaper, magazine, news agency, press association, wire service, radio or television transmission station or network, shall be adjudged in contempt by any court, the legislature or other body having contempt powers, nor shall a grand jury seek to have a journalist or newscaster held in comtempt by any court, legislature or other body having contempt powers for refusing or failing to disclose any news or the source of any such news coming into his possession in the course of gathering or obtaining news for publication”. (L 1970, ch 615, eff May 12, 1970; amd L 1975, ch 316, eff June 24, 1975; emphasis supplied.)
Again, in passing, it should be briefly noted that the statute shields the "professional journalist” only from the contempt power of the court. However, this court finds no rational basis to require petitioner to first appear and refuse to testify, especially when the motion to quash will call for the same analysis of the statute as would be required in a contempt proceeding. Thus, the instant motion will provide ultimate disposition of the issues without further and futile proceedings. (See Matter of Wolf v People, 69 Misc 2d 256, supra; also, see, People v Marahan, 81 Misc 2d 637, supra.)
The statutory privilege (Civil Rights Law, § 79-h), although cast in negative terms that specifically shield journalists from Grand Jury contempt powers (and designed apparently to avoid or overrule Branzburg; see People v Monroe, 82 Mise 2d 850) conceptually rests on a firm base of confidentiality. It is especially significant that the protection of the journalist (from the sanction of contempt) springs from his "refusing or failing to disclose any news or the source of any such news coming into his possession in the course of gathering or obtaining news for publication” (Civil Rights Law, § 79-h, subd [b]; emphasis supplied). Obviously, in every instance, the "news” and the "source” of any such news are inextricably intertwined.
"Thus”, as pointed out by the learned and perceptive Mr. Justice Harold Birns, now Associate Justice of the Appellate *418 Division, First Department, "in order to raise successfully the claim of privilege, two essential elements must be established: first, the information or its sources must be imparted to the reporter under a cloak of confidentiality, i.e., upon an understanding, express or implied, that the information or its sources will not be disclosed; and second, that the information or its sources must be obtained in the course of gathering of news for publication.” (Matter of Wolf v People, 69 Misc 2d 256, 261, supra.)
Clearly, the "cloak of confidentiality” essential to invocation of the privilege is established, as Mr. Justice Birns cogently observed, "upon an understanding, either express or implied, that the information or its sources will not be disclosed.” (Matter of Wolf v People, supra, p 261; emphasis supplied.)
To invoke the privilege the journalist carries the burden of proffering at least preponderant evidence of the mutuality of the understanding, or agreement, of confidentiality. He may do so by direct or indirect evidence, by presenting proof of an express, i.e., a verbalized, understanding or agreement, or by offering preponderant proof of circumstances from which a mutual agreement of confidentiality may reasonably be implied.
Needless to say, the understanding or agreement of confidentiality is express when the terms thereof have been mutually stated by the principals, i.e., by the informant (i.e., source) and by the journalist. And it makes no difference who requests or offers the requisite confidentiality so long as both principals agree thereon. On the other hand, an understanding or agreement of confidentiality may be implied in fact when, from the acts and conduct of the newsman and his informant (i.e., source), or from custom and usage, or from the circumstances surrounding the imparting or gathering of the news, it is reasonable to conclude that the principals mutually intended that the identity of the source and the substance of the news or information would be maintained confidential.
Obviously, no implication of confidentiality will exist where the facts and circumstances are inconsistent with its existence, or are inconsistent with the declarations of the informant or source, or are inconsistent with or opposed to the intention or understanding of either or both of the principals, or, generally, where an express or specific agreement of confidentiality of both identity of source and substance of the news clearly exists.
*419 The final logic is clear. It is the element of confidentiality, of identity withheld, of news or information secretly imparted, that gives birth to the privilege. The genesis of the privilege lies only in the anonymity claimed and confidence given. Without that confidence, of anonymity, the privilege does not exist.
Once the privilege has been established, however, the measurement of its life, i.e., the period of time in which the privilege will exist to immunize the journalist from disclosure, presents an entirely different problem.
Our courts have held that the privilege will not arise where the journalist has personally observed the events, including the identities of the persons of whom he observed, and concerning which he has been subpoenaed to testify. (Matter of Dan v Simonetti, 80 Misc 2d 399; People v Dan, 41 AD2d 687, 688, app dsmd 32 NY2d 764, mot for lv to app den 32 NY2d 613, mot for further stay den 32 NY2d 967) nor will the privilege arise where the news has not been received under a recognizable cloak of confidentiality (People v Wolf, 69 Misc 2d 256, affd 39 AD2d 864, supra; Matter of WBAI-FM v Proskin, 42 AD2d 5).
It follows, and our courts are agreed, that the privilege, may be waived by publication (Matter of Wolf v People, supra, p 257; Matter of Dan v Simonetti, supra, p 403). In affirming Wolf, the Appellate Division, First Department, held, "the statute therefore, cannot be used as a shield to protect that which has already been exposed to view.” (People v Wolf, supra, p 864.)
At bar, petitioner urges that, since there has been no media publication of the news or substance of the information furnished to him, either by "A” or "B”, the statutory privilege (§ 79-h) must still exist to immunize him from the subpoena. Such contention narrows the true nature of the many possible ways in which waiver may occur and petitioner’s contention also ignores the clear wording of the statute, which disjunctively protects the journalist from "refusing * * * to disclose any news or the source of any such news” (Civil Rights Law, § 79-h, subd [b]; emphasis supplied). Conceivably, mere publication of "any such news”, would not, per se, waive the privilege of protecting the identity of the source from disclosure. At the same time, publication solely of the identity of the source, without some reference, at least in part, to "any such news”, would be meaningless.
*420 Petitioner’s reliance here upon nonpublication to support his claim of privilege also ignores the fact that waiver of the privilege will, in most instances, occur only when the informant (i.e., source) waives in some manner or, in fact, publicizes his own identity. Thus, the privilege may be effectively waived either: (1) because the source neither initially sought, nor required, any anonymity; or (2) because the source at some time after expressly requesting anonymity, or after having divulged the news and his identity to a journalist under circumstances from which confidentiality could be reasonably implied, identifed himself at a later date as the source of "any such news”, thereby waiving the confidentiality which undergirds the journalist’s statutory privilege.
The facts here precisely illustrate the foregoing.
As to "A”, the circumstances of his meeting with the petitioner journalist raise a strong and reasonable implication of confidentiality, especially as to his identity, although not necessarily as to the substance of the news or information imparted. After first refusing to talk with the petitioner, "A” was persuaded by "C”, a recognized confidential informant, to meet one evening with "C” and petitioner at "C’s” home. It is undisputed that "A” and petitioner understood and agreed that "C’s” name would not be disclosed. It is undisputed "A” knew of this understanding. There exists then the strong inference that, when "A” appeared by "C’s” invitation in "C’s” home, he, too, understood that his identity would not be made known, perhaps even that the substance of their conversation would not be reported.
But it is also undisputed that sometime after the meeting in "C’s” home, "A” independently and voluntarily met with members of the Special Prosecutor’s staff, identified himself and discussed with them his conversations with the petitioner. "The statute * * * cannot be used as a shield to protect that which has already been exposed to view.” (People v Wolf, 39 AD2d 864, supra.)
As to the individual designated "B”, this court finds no evidence that there existed at any time an express or implied understanding that either the identity or information imparted to petitioner would be held in confidence. "B” knew petitioner well and, presumably, knew of his occupation as a professional journalist. Approached by petitioner at a meeting in the Salina Town Hall, with other persons in the general vicinity, "B” did not refuse to talk, nor did he exact any *421 promise or agreement from petitioner to keep the substance of his conversation, or his identity, a secret. A news reporter’s task is to gather news. That is his bread and butter. "B” knew, or should have known, and appreciated this fact.
The circumstances surrounding "B’s” meeting with the reporter in the Salina Town Hall present no evidence of such secret, furtive, surreptitious or clandestine character that one could reasonably infer the meeting was held "in secret”. The meeting was brief. The setting offers no evidence of the cloak- and-dagger elements so often associated with the transfer or receipt of secret and confidential information. To hold otherwise under the circumstances here would preordain a finding that an implied understanding of confidentiality and anonymity attaches in each instance when a news reporter, at a public gathering, questions another person out of range of the hearing of others and without express reference to future disclosure, or nondisclosure. Such holding would peremptorily foreclose the court’s power to distinguish instances where justice will require that the cloak of confidentially be recognized and maintained and, indeed, could well prevent the courts from justifiably protecting the confidentiality of informed sources when, by all reasonable standards, due process, fair trial, free press and, indeed, personal or public safety, or both, might well require a finding of confidentiality and invocation of the statutory privilege it engenders. The privilege, based as it is upon confidentiality, is an exception "to the general rule which requires disclosure to an authorized government body and must therefore be strictly construed”. (Matter of WBAI-FM v Proskin, 42 AD2d 5, 7, supra.)
The petitioner has failed to carry his burden of proof as to the confidentiality of his interviews with either "A” or "B”.
GRAND JURY TESTIMONY ON COLLATERAL ISSUES
Finally, petitioner urges that his testimony has been solicited solely to bolster the testimony of other witnesses called, or to be called, before the Grand Jury. He contends his testimony will bear only upon collateral issues of credibility and the weight to be given to testimony of others and will, in such event, be merely cumulative.
It must be borne in mind that at this stage of the present proceedings there has been no revelation of the substance of any testimony heretofore heard by the Special Grand Jury nor, for that matter, any revelation of prospective testimony *422 of witnesses not heretofore subpoenaed. The posture of the instant proceeding is unlike that of People v Monroe (82 Misc 2d 850, supra) and People v Barnes (Bronx County Indictment No. 3194/74, cited in Monroe and otherwise unreported). Both of these cases dealt with motions to quash subpoenas ad testiñeandum served by multiple defendants, on professional media personnel, who sought to obtain evidence of an impeaching nature in order to attack the credibility of prosecution witnesses previously called in suppression hearings. In both of these cases the subpoenas of media personnel were quashed.
In Barnes the subpoenas were quashed on grounds of irrelevancy, immateriality and lack of proper foundation for reception of the solicited testimony.
In Monroe (supra, p 857), Mr. Justice Quinn, after reviewing the brief history of the Shield Law (Civil Rights Law, § 79-h) vis-á-vis Branzburg v Hayes (supra) found that "in the main, there was a failure on defendants’ part to lay a proper foundation for the reception of such impeachment evidence. In the very few instances where some semblance of a foundation was put down, the inconsistent statements uncovered were not material to the proof of crimes, the proof of any potential defenses, or to the reduction of the classification or penalties related to the offenses charged. Thus, the inconsistent statements were collateral to the issues, and the information in the hands of the media was irrelevant.” Mr. Justice Quinn held (supra, p 857), "under these circumstances, the privilege of confidentiality must prevail over the rights of the defendant to attempt to impeach the prosecution’s witnesses.”
As above indicated, both the Barnes and Monroe decisions, dispositive as they are of section 79-h privileges asserted during lengthy suppression hearings, must be distinguished from the posture of the instant application to quash. In contrast to Barnes and Monroe, the present application to quash tests the viability of the Shield Law at the threshold of criminal investigation, viz., at the outset of the Grand Jury process, where historically, constitutional and statutorial provisions reasonably provide broad powers of inquiry of compelling societal and governmental concern.
The specific issue the court must décide at this stage, i.e., during the ongoing Special Grand Jury investigation, is whether the testimony solicited from the journalist, not other *423 wise privileged, should be denied to the Special Grand Jury on grounds that it will be cumulative and serve only to resolve correlative issues of credibility and weight.
It belabors the obvious to note that, at this stage, this court has no access to the prospective testimony of the subpoenaed journalist, nor to the testimony of other Grand Jury witnesses and, thus, has no frame of reference within which to assess the validity of petitioner’s claims.
It is just as obvious, however, that the circumstances are significantly different when, as in the instant case, an ongoing Grand Jury seeks a journalist’s testimony, otherwise not privileged, in fulfillment of its role as an investigatory body. The cases are legion, needing no citation,[4] that emphasize the unique investigatory functions and responsibilities of the Grand Jury. The role of the Grand Jury as a vital instrument of law enforcement necessarily includes its basic investigatory function to determine whether or not a crime has been committed and, if so, by whom. To carry out that function it must remain free to call witnesses as it sees fit in order to perform its task.
Grand Jury investigations may be triggered by tips, rumors, evidence proffered by the prosecution, media publications or broadcasts, or by the personal knowledge of the grand jurors. The Grand Jury has the highest obligation to run down all clues, to properly examine all available witnesses and, above all, to sift and weigh the testimony of all witnesses. This duty must necessarily involve a myriad of instances requiring determinations of credibility and of the weight to be given to testimony. No valid reason exists why reporters, if not otherwise privileged, any more than other citizens, should be exempt from providing information that may help the Grand Jury in making its initial determination as to who shall be and who shall not be indicted.
This is not to say that either, or both, the shield of the privilege (§ 79-h), if available, and the rules of evidence, may not at a later stage be legitimately invoked during pretrial stages of discovery, suppression and during the trial to follow in order to ensure due process, fair trial and free press. However, this court is compelled to conclude at this stage of these investigative proceedngs and under the circumstances presented here that the petitioner has failed to offer sufficient *424 proof, either de facto or de jure, that will warrant quashing the subpoena ad testiñcandum.

. At no time during these in camera hearings, nor at any other time, has the court sought or received the names of the individuals who purportedly discussed with the petitioner the affairs of the Town of Salina in 1976.

. It also appears that "A” may have testified before the Special Grand Jury, but this possibility is not confirmed.

. Before Branzburg, First Amendment privileges involving confidentiality could be successfully asserted only after balancing the competing public and private interests (People v Wolf, supra; Barenblatt v United States, 360 US 109, 126; Garland v Torre, 259 F2d 545, cert den 358 US 910; cf. Branzburg v Hayes, supra).

. E.g., see, Branzburg v Hayes, 408 US 665, 686-687, supra.