OPINION OF THE COURT
Patrick W. McGinley, J.
Ellen Count, a professional journalist, currently on assignment for New York Magazine, moves to quash a subpoena duces tecum pursuant to CPLR 2304, served upon her by defense counsel. The subpoena seeks to compel Ms. Count to disclose any original or copy of transcript of a tape recording made by Ms. Count and any notes of interviews conducted with witnesses or participants in the instant case.
Any information possessed by Ms. Count is for the preparation of a magazine article which has yet to be published. Ms. Count became involved in the current proceedings while on assignment for Family Circle magazine. On October 19, 1980, while riding in a patrol car, Ms. Count accompanied two New York City police officers to the scene of the homicide involved in the case on trial, and then to the hospital where the victim was taken.
The defendant is on trial for the murder of his brother-in-law, Anthony Fiore. On the evening in which the shoot *1058 ing occurred, Ms. Count was carrying a recorder, the tape of which has been made available to the police, the District Attorney’s office, and subsequently to defense counsel. Defense counsel and counsel for Ms. Count agree, therefore, that defense counsel’s request under the subpoena for this tape recording is no longer at issue.
Susana Duncan, an editor with New York Magazine, affirms that Ms. Count was placed on assignment to research a proposed article on this case for New York Magazine in August of 1981.
Ms. Count objects to the identification of her confidential sources and to the production of her notes on the grounds that the requested information and documents are privileged under
(1) section 79-h of the Civil Rights Law, commonly referred to as the Shield Law;
(2) general rules of evidence; and
(3) the First and Fourteenth Amendments to the United States Constitution.
Ms. Count contends in her affidavit that some of the people who consented to be interviewed would do so only on the condition that their identity would remain confidential.
Since New York’s Shield Law was only recently amended in July of 1981, a determination of the scope of a reporter’s privilege under the new law, which was amended to strengthen the already existing Shield Law (L 1981, ch 468), appears to be one of first impression.
No privilege existed at common law for a reporter who refused to divulge his information or sources. Shield laws were enacted to abrogate or modify this common-law rule (Matter of Vrazo, 176 NJ Super 455).
The New York Shield Law exempts professional journalists “presently or having previously been employed or otherwise associated with any * * * magazine” from contempt of court for “refusing or failing to disclose any news or the source of any such news coming into his possession in the course of gathering or obtaining news for publication or to be published in a * * * magazine * * * by which he is *1059 professionally employed or otherwise associated in a news gathering capacity notwithstanding that the material or identity of a source of such material * * * gathered by a [professional journalist] * * * is or is not highly relevant to a particular inquiry of government and notwithstanding that the information was not solicited by the journalist * * * prior to disclosure to him.” (Civil Rights Law, § 79-h, subd [b], as amd by L 1981, ch 468, § 2.)
Defense counsel concedes that Ms. Count, who has worked as a reporter or writer for various magazines for some 20 years, is a “professional journalist” within the meaning of the statute.
The court finds that ordering the reporter, under the circumstances of this case, to produce any notes compiled by her concerning interviews with any witnesses or participants connected with this case would be in direct contravention of her statutory rights under the Shield Law. The court holds that the statute protects her from divulging not only the identity of her sources, but also against the compulsory disclosure of any notes (People v Marahan, 81 Misc 2d 637).
“[T]he interests of the press that form the foundation for the privilege are not diminished because the nature of the underlying proceeding out of which the request for the information arises is a criminal trial” such as this (United States v Cuthbertson, 630 F2d 139, 147). A reporter’s interest “in protecting confidential sources, preventing intrusion into the editorial process, and avoiding the possibility of self-censorship created by compelled disclosure of sources and unpublished notes does not change because a case is civil or criminal.” (630 F2d 139, 147.)
Although there may be circumstances in which a reporter’s privilege under the Shield Law may yield to a defendant’s Sixth Amendment right to a fair trial, those circumstances are not presented in the instant case. Precisely what circumstances will constitute the appropriate case in which the Shield Law must yield, remains for future consideration. In this case, the court holds that the reporter is shielded.
The court notes that interpretations of the old Shield Law contain some authority for the proposition that the *1060 defendant, in seeking disclosure, must make some threshold showing that the information sought is material, relevant, and necessary to the proof of the crime charged, the proof of any potential defenses, or to the reduction of the classification or penalties related to the offenses charged (New York Times Co. v Jascalevich, 439 US 1331 [Marshall, J.], on reapplication for stay; United States v Orsini, 424 F Supp 229, affd 559 F2d 1206, cert den 434 US 997; People v Monroe, 82 Misc 2d 850; Matter of Pennington, 224 Kan 573, cert den sub nom. Pennington v Kansas, 440 US 929). However, New York’s Shield Law was amended to exempt professional journalists from contempt “notwithstanding that the material or identity of a source of such material or related material gathered by a [professional journalist] * * * is or is not highly relevant to a particular inquiry of government” (Civil Rights Law, § 79-h, subd [b], as amd by L 1981, ch 468, § 2).
“[W]ords and phrases used in a statute should be given their ordinary meaning when * * * the Legislature has given no indication that a different meaning was intended” (People v Cruz, 48 NY2d 419, 428). The clear language of the New York Shield Law indicates that the Legislature intended to prevent a defendant from conducting a “fishing expedition” into the work product of a reporter, regardless of the relevancy of any material in the reporter’s possession. The reporter’s information and source of such information are privileged regardless of its relevancy. Therefore, no threshold showing, as required in previous cases, would be availing since the statute excludes relevancy as a consideration.
Concededly, a portion of Ms. Count’s interviews was conducted with people who did not demand confidentiality. Neither the old Shield Law nor the 1981 amended version explicitly requires the communication to be confidential in order to be privileged.
Section 79-h of the Civil Rights Law excludes a journalist from contempt “notwithstanding that the information was not solicited by the journalist or newscaster prior to disclosure to him.” Support for the conclusion that the Legislature, in amending the Shield Law, sought to strengthen the privilege contained therein lies in a memo *1061 randum written in support of the proposed amendment by Assemblyman Steven Sanders, who introduced the act to amend the Civil Rights Law. There is, apparently, no other current legislative history. The stated purpose of the amendment is to “correct loopholes and fill gaps in the existing statute * * * The bill guarantees absolute coverage for persons professionally engaged in a news gathering capacity, and grants the journalist sole determination as to when that protection may be waived. The original intent of the Legislature in 1970 is to be reinforced and strengthened. Case history makes it abundantly clear that the courts have been all too often disinclined to follow the letter or even the spirit of the existing law.”
Although cases which have interpreted the old Shield Law have held that it will not protect a reporter where the information imparted was not obtained or received by the journalist as a result of a confidential communication from a confidential source (Solargen Elec. Motor Car Corp. v American Motors Corp., 506 F Supp 546; Matter of WBAIFM v Proskin, 42 AD2d 5; Matter of Wolf v People, 69 Misc 2d 256, affd 39 AD2d 864; People v Zagarino, 97 Misc 2d 181; Matter of Andrews v Andreoli, 92 Misc 2d 410; Davis v Davis, 88 Misc 2d 1; Matter of Dan v Simonetti, 80 Misc 2d 399) the Legislature, in amending section 79-h of the Civil Rights Law, has indicated its intention to do away with the “cloak of confidentiality” requirement. (See Matter of Wolf v People, supra, where the court held that in order to claim a privilege under the old Shield Law, the reporter must establish that the information or its source was imparted to the reporter under a cloak of confidentiality.)
The legal climate has shifted since 1978 when a New Jersey court held reporter M. A. Farber and the New York Times in contempt of court for refusing to comply with a court order to turn over documents in his possession concerning a murder suspect (Matter of Farber, 78 NJ 259, cert den 439 US 997; New York Times Co. v Jascalevich, 439 US 1331, supra). Mr. Farber and the New York Times have recently been pardoned by the Governor of New Jersey and portions of the fines paid by the newspaper have been remitted. The New Jersey Shield Law, like its New York counterpart, has also been amended (NJ Stats Ann, *1062 § 2A:84A-21.1 etseq., as amd by L 1979, ch 479, eff Feb. 27, 1980).
Although the Legislature, in amending section 79-h of the Civil Rights Law, has again refrained from including, explicit language with regard to confidentiality, the court holds that the Shield Law, as amended, protects both the confidential and nonconfidential information imparted to Ms. Count.
Although the defendant may surmise that exculpatory evidence which may be in the possession of Ms. Count may never be brought to light, “absent a specific legislative directive, a citizen ordinarily has no legal obligation to volunteer exculpatory information to law enforcement authorities. Indeed, even if the existence of such an obligation were compatible with our system of government, it could not form the basis of a meaningful rule of law, since the difficulties involved in enforcing the duty could prove to be insurmountable (cf. United States v New York Tel. Co., 434 US 159, 175-176, n 24). In the absence of any such legal duty, the decision whether to volunteer exculpatory information to the police regarding a particular suspect must remain a matter of individual conscience and private choice.” (People v Dawson, 50 NY2d 311, 317-318.)
Although a prosecutor has a legal obligation under Brady v Maryland (373 US 83) to turn over exculpatory information to the defense, a professional journalist has no such legal obligation.
It should be borne in mind that the information in Ms. Count’s possession has not yet been published; neither the prosecution nor the defense nor the public at large has been made aware of its contents or from whom the information was obtained.
This is not the situation where an article has been published before or during trial, creating an expectation that the information or source of such information may be helpful in some way to the defense.
If Ms. Count were compelled to divulge the information in her possession, the literary and commercial value of the article, before its publication, would be dissipated, as would the value of her services to New York Magazine. Ms. *1063 Count’s livelihood depends on her professional and investigative skills. Her many months of research would be frustrated if she were compelled to reveal the information she has gathered, as a result of her own instincts, abilities, or plain serendipity, prior to publication. Industry and luck are equally available to attorneys for defendants.
Compelling this reporter to produce her resource materials significantly intrudes into the news gathering and editorial processes (United States v Cuthbertson, 630 F2d 139, supra). The free flow of information requires protection of sources, especially those that demand confidentiality, in order to prevent them from being deterred from furnishing publishable information. Although the freedom afforded to the press is not absolute (Branzburg v Hayes, 408 US 665), in the instant case, where an investigative reporter has compiled information both confidential and nonconfidential, and where there has been no publication or disclosure of any of the information compiled, and where the defense subpoena duces tecum is a broad and general request for “[n]otes of all interviews with witnesses or participants in this case,” the Shield Law mandates that the subpoena duces tecum be quashed.
Since the court sustains Ms. Count’s motion to quash on the basis of the Shield Law, it is unnecessary to consider the other arguments advanced by counsel in support of the motion.
Accordingly, Ms. Count’s motion to quash the subpoena duces tecum is granted.