OPINION OF THE COURT
Thomas B. Galligan, J.
The Columbia Broadcasting System, Inc. (hereinafter CBS), moves pursuant to CPLR 2304 to quash a subpoena duces tecum served upon it by the District Attorney, seeking any and all video tapes and audio tapes, including outtakes, of conversations and interviews with Frank Terpil and George Gregary Korkala in October or November, 1981 in Beirut, Lebanon. Portions of these filmed interviews were broadcast by the CBS television network on its “60 Minutes” program on November 8, 1981 and rebroadcast on June 20, 1982.
*292 Terpil and Korkala had been tried, convicted and sentenced in absentia in 1980, after it had been determined, at a hearing, that they voluntarily absented themselves from the trial. The gravamen of the indictment was the sale and conspiracy to sell weapons to “terrorists” from an unnamed South American country. Actually, the “terrorists” were undercover New York City police officers.
In the 1981 interview by Mike Wallace, a CBS news correspondent, they discussed their activities as agents “for hire”. Early in 1982 Korkala was apprehended in Spain and after extensive litigation in that jurisdiction, he was extradited to the United States on condition that he receive a new trial here. The United States Government and the District Attorney of New York County having agreed to that condition, the prior judgment of conviction was vacated and a new trial ordered. It is in that posture that the District Attorney served" the subpoena upon CBS which has become the subject of this motion.
CBS argues that the First Amendment to the Constitution of the United States provides a qualified privilege to journalists in these circumstances whereby CBS may decline to divulge the information sought; and second, that section 79-h of the Civil Rights Law (the New York Shield Law) extends to journalists an absolute privilege not to disclose the subpoenaed material.
The District Attorney denies that the subpoena will infringe on or compromise any First Amendment right and further that the Shield Law provides no protection absent either an express or implied agreement between the informant and the journalist that the information was imparted in confidence.
The contention by CBS, that it possesses a constitutional privilege not to disclose the subpoenaed information, casts in issue the historic tension between the First Amendment guarantees of a free and unfettered press and the equally fundamental imperatives of due process and fair trial.
The responsibility for reconciling and accommodating these sometimes polarized constitutional demands has traditionally fallen and does today fall to the courts. This process requires a delicate balancing of interests by the court.
*293 “The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.” (Branzburg v Hayes, 408 US 665, 710.)
The application of this principle to the facts at bar requires a weighing of the respective interests of each party and an assessment of the over-all interests of society as a whole. In doing so, it is significant that CBS is not being requested to disclose a confidential source, but rather information freely disclosed by a known informant. The interest of society in the fair administration of justice and the full disclosure of all facts material to a criminal trial is all the more compelling when “it is information which is being withheld and not the identity of the source. (See New York Times Co. v Jascalevich, 439 US 1317, 1331.)” (People v Le Grand, 67 AD2d 446, 453.) Moreover, the inconvenience to CBS in requiring production of this information, if there be any, is clearly minimal.
Balanced against this is the interest of the People in having a criminal trial proceed upon a full exposition of all relevant and material facts. Manifestly, the words of the defendant, in the context of this case, are very highly probative. (Cf. People v Marahan, 81 Misc 2d 637, 643-644 [reporter’s notes and testimony for impeachment on collateral issue protected].)
In advancing its claim of First Amendment privilege, CBS claims that a journalist is protected from the compelled disclosure of unpublished information in criminal as well as civil cases unless the party seeking such information demonstrates that it is: (1) highly material and relevant; (2) central to the claims at issue; and (3) unavailable from alternative sources. Movant alleges that the District Attorney has not met his burden on these issues.
The three-pronged test suggested had its genesis in the dissenting opinion of Justice Stewart in Branzburg v Hayes (408 US 665, supra) and was rejected in the concur *294 ring opinion of Justice Powell. (Branzburg v Hayes, supra, p 710.)
Recently, in Matter of Beach v Shanley (94 AD2d 542, 544, revg Matter of Grand Jury Investigation, 118 Misc 2d 195), where the County Court quashed a subpoena served upon a television newscaster requiring him to testify before a Grand Jury, Justice Yesawich, speaking for a unanimous court, noted that the petitioner interpreted “Justice Powell’s concurring opinion (Branzburg v Hayes, 408 US 665, 709, supra) as adopting a test akin to that preferred by Justice Stewart in his dissent, namely, that the prosecution must demonstrate that the intelligence to be gathered from the reporter is absolutely necessary to the investigation, that there is a compelling and overriding governmental interest in obtaining the testimony, and that the information sought cannot be obtained by other means less destructive of First Amendment rights (supra, at p 743). We disagree, for we read Justice Powell’s concurrence not as sanctioning this type of balancing test, but as criticizing it for unfairly subordinating ‘the essential societal interest in the detection and prosecution of crime’ (supra, at p 710, n; see Matter of Farber, 78 NJ 259, cert den sub nom. New York Times Co. v New Jersey, 439 US 997).”
United States v Burke (700 F2d 70) appears to have adopted the three-pronged test in criminal cases. However, a careful reading of Branzburg (supra) would not seem to require such a finding. In any case, even if the three-pronged test were applied to the facts of this case, it is clear that the interview provides relevant material which cannot be obtained from any other source than CBS, and the subject matter of the interviews speaks directly to the issues to be litigated at trial. The public interest in the fair administration of justice countervails any insignificant burden to CBS, and the record here is barren of any evidence that disclosure of this information will inhibit or chill the ability of CBS effectively to gather and report news in the future. (See Matter of Dan v Simonetti, 80 Misc 2d 399; People v Dupree, 88 Misc 2d 791; People v Zagarino, 97 Misc 2d 181; People v Le Grand, 67 AD2d 446, supra.)
Accordingly, the motion to quash the subpoena on constitutional grounds is denied.
*295 In evaluating the extent of the privilege afforded newsmen by the Shield Law, it is necessary to determine whether the statutory privilege encompasses both confidential and nonconfidential information. It should be noted that the Shield Law does not refer to confidential and nonconfidential information, in haec verba, in either its original form or as presently constituted.
In ascertaining legislative intent, a comparison of the present and the former statute can be useful. (Hezekiah v Williams, 106 Misc 2d 407, affd 81 AD2d 261; 56 NY Jur, Statutes, § 90.)
The first draft of the amendment of the Shield Law (A. 4547, S. 3553) in the 1981-1982 Regular Sessions, contained 11 “notwithstanding” clauses in subdivision (b) of section 79-h of the Civil Rights Law, which delineate the scope of the statute’s protection. One of the clauses stated that the protection of the Shield Law would apply to information “notwithstanding the source of such information having been or being confidential or non-confidential”; another stated that “notwithstanding the information having been in part or in whole publicly disseminated or not publicly disseminated, published or unpublished, broadcasted or not broadcasted”; a third clause stated “notwithstanding the source of such information having been identified or not identified.”
The next version of the bill (A. 4547-A, S. 3553-A) in the same session, eliminated 8 of the 11 “notwithstanding” clauses including the three listed above. The final version of the bill, which was ultimately enacted into law on July 7, 1981 (A. 4547-B, S. 3553-B), did not include the clauses referred to above which were part of the first draft.
While not dispositive on the issue of legislative intent, the rejection of specific statutory provisions is a significant consideration when divining legislative intent. (People for Environmental Progress v Leisz, 373 F Supp 589; see Fox v Standard Oil Co., 294 US 87; Passenger Corp. v Passengers Assn., 414 US 453.) Consequently, the rejection on the part of the State Legislature of a provision which would have rendered nonconfidentially imparted information to be privileged is of some import in determining whether the *296 statute as amended distilled out the predicate of confidentiality.
CBS suggests that the inclusion of the three quoted “notwithstanding” clauses (supra) is not necessary and would be mere surplusage. It further suggests that the Shield Law provides that journalists may refuse to disclose “any news or the source of any such news” obtained in the course of their professional activities. Therefore, argues CBS, by “its explicit reference to any news, the statute makes clear that its protection extends not only to confidential sources, but also to all unpublished information.” However, the Shield Law prior to its amendment in 1981 had that very language and the courts have consistently interpreted it to refer to confidential information. (Matter of WBAI-FM, 68 Misc 2d 355, affd sub nom. Matter of WBAI-FM v Proskin, 42 AD2d 5 [in the dissent by Cooke, J. (now Chief Judge), he stated (p 9): “The entire thrust of section 79-h is aimed at encouraging a free press by shielding those communications given to the news media in confidence. Before the communication can be shielded, it must be shown that it was imparted under a cloak of confidentiality upon an understanding, express or implied, that either the information or its sources, or both, would not be revealed, as the case might be.”]; Matter of Andrews v Andreoli, 92 Misc 2d 410; Matter of Dack [Beni Broadcasting of Rochester), 101 Misc 2d 490; Matter of Wolf v People, 69 Misc 2d 256, affd sub nom. Matter of Wolf, 39 AD2d 864.)
In construing the journalistic privilege of the Shield Law two months after the effective date of the 1981 amendment (though the case on appeal had been decided at a time prior to the amendment), the Appellate Division, Fourth Department, held, “such privilege may be invoked only after there has been established an express or implied agreement of confidentiality (Matter of Dack [Beni Broadcasting of Rochester], 101 Misc 2d 490; Matter of Andrews v Andreoli, 92 Misc 2d 410).” (Hennigan v Buffalo Courier Express Co., 85 AD2d 924; see, also, People v Bova, 118 Misc 2d 14.) More recently, the Second Department has held, “As noted in Matter of Andrews v Andreoli (supra, p 417), although the Shield Law is cast in negative terms to shield the *297 newsman from contempt, it ‘conceptually rests on a firm base of confidentiality’.” (Oak Beach Inn Corp. v Babylon Beacon, 92 AD2d 102, 103-104.)
CBS cites two recent cases to establish its thesis that a newsman has an absolute privilege under the Shield Law and not a qualified one as suggested by the District Attorney. In People v Iannaccone (112 Misc 2d 1057, affd without opn 96 AD2d 488), the court stated that the Shield Law, as amended, protects both the confidential and nonconfidential information imparted to a reporter and that whereas older cases interpreting the Shield Law found that a confidential communication from a confidential source was required before its protection attached, the Legislature by amending section 79-h of the Civil Rights Law has indicated its intention to do away with the “cloak of confidentiality” requirement. The legislative history as outlined above compels me to reach a conclusion different than Iannaccone, and recent appellate cases (Hennigan v Buffalo Courier Express Co., supra; Oak Beach Inn Corp. v Babylon Beacon, supra) confirm that confidentiality is still the touchstone of the privilege.
In the second case cited by CBS, Wilkins v Kalla (118 Misc 2d 34, 36), the court concluded that since the Shield Law, as amended, “provides that journalists may refuse to disclose ‘any news or the source of any such news’ [therefore by] its explicit reference to ‘any news,’ the statute makes clear that its protection extends not only to confidential sources, but also to all unpublished information.” (Emphasis added.) The Wilkins court found this conclusion compelling by virtue of the additional language of the amendment in a “notwithstanding” clause prohibiting the disclosure, even when the material or identity of a source of such material is or is not highly relevant to a particular inquiry of government. However, the court apparently overlooked the fact that the “any news” language was not an amendment to the statute. It had existed in the statute prior to the amendment. The “notwithstanding” clause addressed the question of relevance and removed it as a predicate for compelling disclosure. It in no way extended the qualified privilege to be an absolute one.
*298 Clearly, the relevant legislative history of a statute provides an important source of insight into the meaning and intent of the law as enacted and carries probative force when construing the effect of the statute (2A Sutherland, Statutory Construction, § 48.02).
CBS argues that a legislative intent to enact an absolute privilege is evidenced in a memorandum drawn by the sponsoring legislator in which it is stated: “The bill guarantees absolute coverage for persons professionally engaged in a news-gathering capacity, and grants the journalist sole determination as to when that protection may be waived.” (NY Legis Ann, 1981, p 257; see People v Iannaccone, 112 Misc 2d 1057, affd 96 AD2d 488, supra.)
In examining this history, it is worth noting that “The statement of a legislative sponsor is of little weight regarding legislative interpretation when not made during floor debate and there is no showing that other legislators were aware of its scope. (Matter ofDelmar Box Co. [Aetna Ins. Co.], 309 NY 60, 67).” (Kruger v Page Mgt. Co., 105 Misc 2d 14, 25.)
An analysis of the Shield Law cannot, therefore, rest exclusively on this memorandum. Rather, the process of statutory construction requires that the statute be interpreted in light of all legislative history. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 125; Hezekiah v Williams, 106 Misc 2d 407, affd 81 AD2d 261, supra.)
In a memorandum for the Governor, the Attorney-General analyzed the proposed changes to the Shield Law. In pertinent part, that memorandum states, “The bill would expand the journalists’ privilege but not create an absolute privilege. Unlike an earlier draft, this version does not protect journalists from being held in contempt for failure to divulge requested information when the requested information, inter alia, is not confidential; has been publicly disseminated, published or broadcast; originated with an identified source; has already been disclosed; or was based upon personal observation. Such protection would remain, as it is under the current law, in the discretion of the courts.” (Memorandum for Governor, Re: A. 4547-B/S. 3553-B, Robert Abrams, Attorney-General.) The Attorney-General’s memorandum was received after action by the *299 Governor, so presumably it did not influence the decision to sign the bill. Both the legislative history of this statute and the relevant judicial authorities confirm that the protection of the Shield Law rests on confidentiality. This conclusion is consistent with the will of the Legislature and is a rational limitation on a statutory privilege which, in absolute form, could readily render the constitutional guarantees of due process and of the Sixth Amendment unenforceable abstractions.
It is unchallenged that the subpoenaed information was not imparted pursuant to an agreement that it would be kept confidential. It follows that the absence of such an agreement, tacit or otherwise, takes the subject information beyond the protective provisions of section 79-h of the Civil Rights Law. Therefore, the motion to quash the subpoena on the grounds of statutory privilege is also denied.